Ellen BRAUNE, Juli Ann Harnett, Elizabeth Rougny, and Kathryn Sullivan Lincoln, Plaintiffs,

v.

The ABBOTT LABORATORIES, Boyle & Co. Pharmaceuticals, Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc., Chase Chemical Co., Chromally American Corporation, Dart Industries, Inc., p/k/a Rexall Drug Co., Inc., Eli Lilly & Co., Kremers–Urban Co., n/k/a Mequon Co., Lincoln Laboratories, Inc., Mallincrodt Inc., McNeilab, Inc., S.E. Massengill, a/k/a Beechum, Inc., Merrell Dow Pharmaceuticals, Inc., Premo Pharmaceutical Laboratories, Inc., p/k/a Lemmon Co. of N.J., Inc., Rite–Aid Corporation, Rhone–Poulenc Rorer Pharmaceuticals, Inc., p/k/a William H. Rorer, Inc., Rowell Laboratories, Inc., Schering Group, Solvay Pharmaceuticals, Inc., formerly known as Reid–Prov-

ident Laboratories, Inc., Stanley Drug Products Inc., A Division of Sperti Drug Corporation, E.R. Squibb & Sons, Inc., The Upjohn Company, and West–Ward, Inc., n/k/a Industrial Way Liquidating Corp., Defendants.

Barbara Beth JELLOW, Lynn Yarnall, Kerry Ellen Zahn, Katie King Larson, Lori Beth Minor, Susan Allsopp, and Eve Marie Colello–Moltzen, Plaintiffs,

v.

The ABBOTT LABORATORIES, Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc., Chase Chemical Co., Chromally American Corporation, Dart Industries, Inc., p/k/a Rexall Drug Co., Inc., Eli Lilly & Co., Emons Industries, Inc., p/k/a Amfre Grant, Kremers–Urban Co., n/k/a Mequon Co., Lannett Co., Inc., Lincoln Laboratories, Inc., McNeilab, Inc., S.E. Massengill, a/k/a Beechum, Inc., Merck & Co., Inc., Merrell Dow Pharmaceuticals, Inc., Premo Pharmaceutical Laboratories, Inc., p/k/a Lemmon Co. of N.J., Inc., Rite–Aid Corporation, Rhone–Poulenc Rorer Pharmaceuticals, Inc., p/k/a William H. Rorer, Inc., Rowell Laboratories, Inc., Schering Corporation, Solvay Pharmaceuticals, Inc., p/k/a Reid–Provident Laboratories, Inc., Stanley Drug Products Inc., A Division of Sperti Drug Corporation, E.R. Squibb & Sons, Inc., The Upjohn Company, and West–Ward, Inc., n/k/a The Industrial Way Liquidating Corp., Defendants.

Mary SERRI, Tina Lee Babb, Laura Cassell, Michele Friedman, Cindy Nadelbach, Karen Proodian, Regina Sica, and Paige White, Plaintiffs,

v.

The ABBOTT LABORATORIES, Boyle & Co. Pharmaceuticals, Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc., Chromally American Corporation, Dart Industries, Inc., p/k/a Rexall Drug Co., Inc., Eli Lilly & Co., Kremers–Urban Co., n/k/a Mequon Co., Lannett Co., Inc., McNeilab, Inc., Mallincrodt, Inc., S.E. Massengill, n/k/a SmithKline Beechum, Corp., Merck & Co., Inc., Premo

Pharmaceutical Laboratories, Inc., p/k/a Lemmon Co. of N.J., Inc., Rhone–Poulenc Rorer Pharmaceuticals, Inc., p/k/a William H. Rorer, Inc., Rowell Laboratories, Inc., Schering Corporation, E.R. Squibb & Sons, Inc., The Upjohn Company, and West–Ward, Inc., n/k/a The Industrial Way Liquidating Corp., Defendants.

Nos. 95–CV–0209 (JBW), 95–CV–0506 (JBW) and 95–CV–1230 (JBW).

United States District Court, E.D. New York.

Aug. 16, 1995.

Law Office of Sybil Shainwald, P.C., New York City by Sybil Shainwald, Letitia W. Clark, for plaintiffs.

Patterson, Belknap, Webb & Tyler, New York City by Robert D. Wilson, Jr., for Abbott Laboratories and McNeilab, Inc.

Lester Schwab Katz & Dwyer, New York City by Catherine Feehan, for Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc. and Merrell Dow Pharmaceutical, Inc.

Schneck, Weltman, Hasmall & Mischel, LLP, New York City by Leonard F. Lesser, Edward S. Weltman, for Chromally American Corp. and Premo Pharmaceutical Laboratories, Inc., p/k/a Lemmon Co. of N.J., Inc.

Winthrop, Stimson, Putnam & Roberts, New York City by A. Edward Grashof, for Dart Industries Inc., p/k/a Rexall Drug Co.

Beatie, King & Abate, New York City by Samuel J. Abate, Russell H. Beatie, Charna L. Gerstenhaber, Susan Kelty Law, for Eli Lilly & Co.

Anderson Kill Olick & Oshinsky, P.C., New York City by Eric D. Statman, for Emons Industries, Inc., a/k/a Amfre Grant.

Cooper, Kardaras & Scharf, New York City by Lori S. Evenchick, for Kremers–Urban Co., n/k/a Mequon Co.

Jaffe, Raitt, Heuer & Weiss, Detroit, MI, for Lannett Co., Inc.

Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for Mallincrodt Inc.

Pitney Hardin Kipp & Szuch, Florham Park, NJ by Joseph E. Hopkins, for S.E. Massengill, n/k/a SmithKline Beechum Corp.

Hughes Hubbard & Reed, New York City by Robb William Patryk, for Merck Co., Inc.

Law Offices of R. Patrick White, New York City by Bruce D. Margolin, for Rhone–Poulenc Rorer Pharmaceuticals, Inc., p/k/a William H. Rorer, Inc.

Gladstein & Isaac, New York City by Robert L. Boydstun, M. Leeann Irvin, for Rowell Laboratories, Inc.

Law Offices of Henry R. Simon, White Plains, NY by Linda Trummer Napolitano, for Schering Corp. and West–Ward, Inc., n/k/a Indus. Way Liquidating Corp.

Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A., New York City by Marc S. Klein, Bennet Susser, for E.R. Squibb & Sons, Inc.

Sedgwick, Detert, Moran & Arnold, New York City by Richard Adam Schioppo, Randi Faith Seffinger, Rivkin, Radler & Kremer, Uniondale, NY by Frank J. Giliberti, for Upjohn Co.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

Table of Contents

| | | |
|---|---|---|
| I. | FACTS | 537 |
| | A. Babb | 537 |
| | B. Cassell | 538 |
| | C. Colello–Moltzen | 538 |
| | D. Friedman | 539 |
| | E. Harnett | 539 |
| | F. Larson | 539 |
| | G. Minor | 540 |
| | H. White | 541 |
| | I. Zahn | 541 |
| II. | LAW APPLICABLE TO STATUTES OF LIMITATIONS–BASED CHALLENGES | 541 |
| | A. New York Statute of Limitations and Discovery Rule | 542 |
| | 1. Statute | 542 |
| | 2. Awareness that "injury" was due to human cause | 543 |
| | a. Language of the statute | 543 |
| | b. Precedents | 545 |
| | c. Comparison of sections 214–c(2) and 214–c(4) | 546 |
| | d. Legislative design | 547 |
| | e. Policy | 551 |
| | f. Likely New York Court of Appeals' construction | 553 |

 B. Standard of Constructive Knowledge ............................................. 554
 C. Two–Injury Rule ................................................................. 555
 D. Jury Resolution of Factual Disputes ............................................ 556
 E. Suits by Nonresidents........................................................... 557
 1. Borrowing statute........................................................ 557
 a. Applicability to section 214–c...................................... 557
 b. Date and place of accrual........................................... 558
 i. Place of encounter with harmful instrumentality ............. 559
 ii. Place where injury is perceived ............................ 559
 iii. Place where viable cause of action becomes possible ....... 560
 iv. Place of "last event"...................................... 561
 v. Place where injury was manifested .......................... 562
 vi. Possible applicability of "interest" analysis once New York is ruled out as
 accrual jurisdiction .................................... 565
 vii. Place most favorable to defendant ........................ 566
 c. Jury resolution of factual disputes ................................ 566
 2. Other states' statutes of limitations.................................... 566
 a. Harnett ............................................................ 567
 b. Larson ............................................................. 567
III. APPLICATION OF STATUTE OF LIMITATIONS LAW TO FACTS.................. 567
 A. Babb ........................................................................... 567
 B. Cassell........................................................................ 567
 C. Colello–Moltzen ............................................................... 568
 D. Friedman ...................................................................... 568
 E. Harnett........................................................................ 568
 F. Larson......................................................................... 568
 G. Zahn .......................................................................... 568
IV. SUBSTANTIVE CHALLENGES—HARNETT, MINOR AND WHITE ................. 569
V. CONCLUSION...................................................................... 569

---

Defendants, formerly producers for use in pregnancy of diethylstilbestrol (DES), seek summary judgment against nine of nineteen plaintiffs in three separate actions. They assert statute of limitations defenses and the applicability, under choice-of-law principles, of substantive law that arguably precludes plaintiffs' theories of liability.

As indicated in the body of this memorandum, under New York law the statute of limitations is triggered when a plaintiff either discovered or reasonably should have discovered her "injury" from DES. Required is a showing not only that the plaintiff knew she was "ill," but also that she was aware or should have been aware that her medical problem stemmed from "human" rather than "natural" causes.

Because unresolved critical questions of fact require jury consideration in each of the cases, defendants' motions are denied, except as noted below in the Minor, Harnett and White actions.

## I. FACTS

DES is a synthetic drug that was prescribed between 1947 and 1971 to prevent miscarriages. The Food and Drug Administration banned this use of the drug in 1971 after studies indicated that *in utero* exposure to DES caused rare forms of vaginal and cervical cancer. *See, e.g., Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982); *In re New York County DES Litig.,* 142 F.R.D. 58, 59 (E.D.N.Y.1992) (summary of cases); *In re DES Cases (Ashley v. Abbott Lab.),* 789 F.Supp. 552 (E.D.N.Y.1992) (jurisdiction).

Plaintiffs claim that their various reproductive tract abnormalities and pregnancy-related difficulties, including infertility and miscarriages, were caused by DES exposure. Insofar as the relevant facts can be determined, they are as follows:

### A. Babb

Tina Lee Babb's complaint was filed on March 28, 1995. Babb has been a New York resident her entire life. New York was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the pre-

scribing physician, the state where Babb was born and apparently the state where her alleged medical problems were diagnosed. They include two miscarriages, an ovarian cyst, an abnormal pap smear and reproductive tract abnormalities.

Babb consulted a "DES specialist" in 1983 or 1984 when she was 12, after her mother told her she was a DES daughter. A colposcopy revealed an abnormal uterus in 1987 or 1988. Ovarian cysts were diagnosed in 1990. She experienced miscarriages in 1990 and 1993.

She contends that she was not told that her miscarriages were caused by DES. The connection between her miscarriages and DES was learned, she claims, in 1995 from a newspaper article.

### B. Cassell

Laura Cassell's complaint was filed on March 28, 1995. Cassell has been a New York resident her entire life. New York was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician, the state where Cassell was born and apparently the state where her alleged medical problems were diagnosed. They include an incompetent cervix, a T-shaped uterus, infertility and fear of DES-related cancer.

Based upon a suggestion from her doctor during a 1985 consultation regarding her intention to conceive, Cassell asked her mother if she had taken any medication during pregnancy. Her mother responded that she had taken a drug to prevent miscarriages. Cassell's doctor concluded then that plaintiff had probably been exposed *in utero* to DES.

Cassell was advised that she had an incompetent cervix in 1985. In 1986, she was diagnosed as having an infantile T-shaped uterus; she was also told in that year that she was at risk for DES-related cancer. In the late 1980s, she consulted with a fertility specialist and contacted a national fertility support group. In 1989, significant levels of antisperm antibodies were found, and a pelvic exam revealed various cervical abnormalities. Artificial insemination attempts in 1989 and 1990 were unsuccessful. A 1992 laparoscopy confirmed cervical abnormalities.

Cassell alleges that she did not connect her infertility to her DES exposure until January 1995, when she read a news article about DES. In an affidavit, she asserts that, while she was informed earlier that she might have trouble carrying a pregnancy to term, she was not told until March of 1993 that she might be infertile.

### C. Colello–Moltzen

Eve Marie Colello–Moltzen's complaint was filed on February 3, 1995. She is currently a California resident. Massachusetts was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled and the residence of the prescribing physician. Colello–Moltzen's family lived near the Rhode Island border, and she was born in a Rhode Island hospital. Based on the pleadings to date, it appears that Colello–Moltzen's alleged medical problems were diagnosed in California. They include an incompetent cervix, vaginal and cervical adenosis, pregnancy requiring hospitalization, pregnancy requiring cerclage placement, a miscarriage, abnormal pap tests and emotional suffering.

In 1977, Colello–Moltzen's mother informed plaintiff of her DES exposure. During the course of a 1989 pregnancy, plaintiff consulted a doctor who, according to a medical record, informed her of potential pregnancy complications due to DES, including the possibility of an incompetent cervix. That pregnancy ended in a miscarriage. Although she experienced serious complications during her second pregnancy (1990) and third pregnancy (1994), both were successful. She had an abnormal pap smear in September 1990.

Colello–Moltzen contends that her cause of action did not accrue until 1994 when, during a pregnancy, a doctor told her that she had an incompetent cervix caused by DES. In an affidavit submitted in opposition to defendant's motion, she states that: 1) with respect to the causes of her first miscarriage, her doctor only informed her that "many women miscarry during their first pregnancy"; 2) her doctor informed her that stress

was the cause of the preterm labor she experienced during her first successful pregnancy; 3) no doctor ever informed her, prior to the 1994 diagnosis, that her DES exposure would prevent normal pregnancies. This affidavit appears to conflict in some respects with the notation about a doctor-patient discussion in her 1989 medical record noted above.

### D. Friedman

Michele Friedman's complaint was filed on March 28, 1995. She has been a New York resident since 1989, and also lived in New York from 1986 into 1987. New Jersey was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician and the state where Friedman was born. New York was apparently the state where her alleged medical problems were diagnosed. They include infertility, three miscarriages and a T-shaped uterus.

Friedman's mother informed her of the DES exposure in 1981. Plaintiff underwent a hysterosalpinogram and a hysteroscopy in 1990. A medical report issued in connection with the hysterosalpinogram noted a T-shaped uterus that "is consistent with DES syndrome." She reported during a 1991 Brooklyn Fertility Center consultation that she had experienced three miscarriages. She asserts that she asked her doctor in 1991 if her difficulty in conceiving was due to DES, but that he refused to express an opinion. On June 16, 1995, she underwent a hysterosalpinogram and a sonogram to determine the cause of her infertility.

Friedman contends that she was unaware of the connection between her DES exposure and her medical problems until 1994, when she heard of a DES "class action" and underwent additional testing. In an affidavit submitted by the plaintiff, she contends that she was never informed that her miscarriage or infertility was related to her DES exposure, or that her T-shaped uterus would make it impossible for her to conceive. Since she believed that cancer was the only medical problem caused by DES, she states that she did not attribute her miscarriages and infertility to DES.

### E. Harnett

Juli Ann Harnett's complaint was filed on January 17, 1995. She is currently a resident of Florida, where she moved in 1990 from Colorado, her former residence. Colorado was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician and the state where Harnett was born. She was either a resident of Colorado or Florida when her various alleged medical problems were diagnosed. They include a T-shaped uterus, an abnormal right fallopian tube, an irregular pattern on her uterine wall and infertility.

Medical records demonstrate that Harnett knew of her DES exposure and was being medically monitored for potential complications in 1973. Records from the 1980s and into the 1990s document consultations with doctors over perceived problems with infertility. A 1989 hysterosalpinogram revealed a T-shaped uterus, irregular uterine walls and an abnormal right fallopian tube. Harnett underwent various fertility procedures in 1990. None were successful. Plaintiff and her husband subsequently adopted two children.

Harnett contends that she learned "[s]ometime in 1992 ... that she [would] not be able to conceive due to her *in utero* DES exposure." At the time of oral argument, plaintiff's deposition had not been taken. Her attorney anticipated demonstrating that, notwithstanding plaintiff's medical records, Harnett was unaware of her medical problems until relatively recently.

Harnett alleges, pursuant to an anticipated affidavit by the prescribing pharmacist, that Eli Lilly & Co. manufactured the DES ingested by her mother.

### F. Larson

Katie King Larson's complaint was filed on February 3, 1995. She has been a Texas resident since 1981; other relevant residences include Kentucky (1968–1971), California (1971–1972, 1974–1979) and Virginia

(1972–1974). She also lists Mexico as a residence from 1976–1977. Alaska was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician and the state where Larson was born. It is unclear from the record where each of her alleged medical problems were diagnosed. They include a T-shaped uterus, small uterine cavity, small os, vaginal adenosis, incompetent cervix, abnormal pap smears, infertility, endometriosis and mental distress.

Larson was informed by her mother that she was a DES daughter in 1972 or 1973, and she was taken for a DES gynecological check-up at that time. Thereafter, she was monitored for possible medical problems related to her DES exposure. Medical records from the 1970s into the 1980s document adenosis, "vaginal changes" and dysplasia. These diagnoses required various medical interventions, including cryosurgery and laser vaporization of the ectocervix. Her deposition confirms that during this time she was aware of some of the potential problems she faced due to her DES exposure—especially cancer.

Larson consulted a doctor in 1987 in connection with her decision to try to become pregnant. Proactively, and at her sister's suggestion, she requested a hysterosalpinogram to try to determine whether she could carry a pregnancy to term. A 1988 hysterosalpinogram revealed a small T-shaped uterus. Medical records indicate that her doctor informed her that she might have difficulty becoming pregnant and that she risked preterm labor.

In 1989, Larson consulted with a doctor about her inability to become pregnant. Fertility treatments were suggested. She returned to her doctor's office in 1990, still complaining of difficulties in becoming pregnant. Various fertility treatments, including five artificial inseminations, were attempted prior to August 1991. At her deposition, she asserted that she was "probably" informed of her incompetent cervix prior to 1991. Plaintiff attended an adoption seminar in April 1992, and was approved for adoption in March of 1993. A letter dated May 21, 1992, that she obtained from her doctor in connection with her intention to adopt, states "Ms. King was exposed to DES as an embryo, and has an abnormal HSG as a result"; notes "an ovulation disorder" which has not responded to medication; and identifies "adoption" as her "best option." Plaintiff adopted a child in 1993. She has never been pregnant although she stopped using birth control many years ago.

On February 6, 1995, plaintiff underwent a laparoscopy that revealed endometriosis. Defendants note that a laparoscopy examination was recommended by two of her doctors in 1991, but that she did not undergo the procedure until 1995. Surgery was performed to remove the visible endometriosis.

Larson contends in an affidavit that she was never told, in connection with her medical problems, that she was sterile or would be unable to bear a child. She asserts that cancer was the only potential manifestation about which she was concerned when she initiated medical consultations in relation to her DES exposure. She testified during her deposition that a fertility specialist informed her, during a fertility consultation on or after August 1991, when she began seeing the specialist, that her DES exposure "was not an issue"—that "there [were] still things that I could attempt in order to get pregnant." She points to other potential sources of her difficulties in becoming pregnant—her husband's possible impotence, their difficulty finding time together—that she asserts made a conclusion about her own infertility premature. Plaintiff states that she is still unsure if she is infertile. She is still attempting to conceive. She contends that she was not aware of defendants' liability until she learned, through the media, about a lawsuit filed in New York in 1994.

G. Minor

Lori Beth Minor's complaint was filed on February 3, 1995. She is currently an Iowa resident. Iowa was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician, the state where Minor was born and apparently the state where her alleged medical problems

were diagnosed. They include a small T-shaped and hypoplastic uterus, a hooded cervix, abnormal pap smears, fear of cancer and infertility.

Defendants' motion with respect to Minor rests solely on Iowa's substantive law, which requires identification of the specific manufacturer of the DES to which a plaintiff was exposed. In response to defendants' "Preliminary Request for Information," Minor asserted that Eli Lilly & Co. manufactured the DES ingested by her mother. Her assertion is supported by an affidavit by the owner of the prescribing pharmacy which states that "Lilly brand of DES" was the only brand carried by the pharmacy from 1960 to 1970, encompassing the period of plaintiff's exposure. She was born in 1963.

### H. White

Paige White's complaint was filed on March 28, 1995. White is currently a resident of the state of Kentucky, where she has lived for the past 21 years, and where her alleged medical problems were diagnosed. Georgia was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of the prescribing physician and the state where White was born. Her alleged medical problems include a stenotic cervix and a small uterine cavity.

■ Defendants' motion with respect to White rests solely on Georgia's substantive law. Georgia has not recognized market share liability. In opposition to defendants' motion, White has submitted an affidavit which states "[m]y mother told me that she recalls [that] the brand of DES that she took during her pregnancy with me was Eli Lilly."

### I. Zahn

Kerry Ellen Zahn's complaint was filed on February 3, 1995. Plaintiff has been a resident of either Virginia (August 1988–August 1990 and August 1993–present) or Massachusetts (1964–August 1988 and August 1990–August 1993) since birth. Massachusetts was the state of her mother's residence during the pregnancy, the state in which the DES prescription was filled, the residence of

the prescribing physician and the state where Zahn was born. Some of plaintiff's alleged medical problems were apparently diagnosed while she was a Massachusetts resident and others while she was a Virginia resident. They include a T-shaped uterus, other uterine abnormalities, a cockscomb cervix, abnormal fallopian tubes, adenosis and infertility.

Zahn was informed when she was 14 that her mother had ingested DES. She was tested at a DES clinic for cervical and vaginal cancer at that age. She consulted two doctors about some difficulties with conception in 1990 and 1991. She was diagnosed at the end of 1991 as having a blocked right fallopian tube, a small uterus, a short cervix and a small cervical opening. A hysteroscopy revealed a uterine ridge. In deposition testimony, she stated that she was informed by her doctor in October of 1991 that she would not be able to become pregnant without *in vitro* fertilization. She also stated that she told her doctor, in late 1990 or early 1991, that "I was DES exposed, that I wasn't pregnant and what was I going to do about it." By January 1992, she began the process for *in vitro* fertilization.

Zahn contends that not until a 1993 hysterosalpinogram did she learn that she has an infantile T-shaped uterus and that it was due to DES exposure. At that time, she asserts, her doctor informed her that a miscarriage and her difficulty in conceiving could be attributed to abnormalities in the size and shape of her uterus. Defendants counter that none of her records submitted to date indicate the presence of a T-shaped uterus. Defendants also point to a radiology report prepared in connection with the 1991 hysterosalpinogram that characterized plaintiff's uterus as having a "normal appearance."

### II. LAW APPLICABLE TO STATUTES OF LIMITATIONS–BASED CHALLENGES

Defendants assert that claims made by Babb, Cassell, Colello–Moltzen, Friedman, Harnett, Larson and Zahn are time-barred under the applicable statutes of limitations.

Federal courts sitting in diversity apply the substantive law of the forum state on outcome-determinative issues, *Erie R.R. v. Tompkins,* 304 U.S. 64, 80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1988), including the forum state's approach to choice-of-law problems, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), and the forum state's applicable statute of limitations, *see Guaranty Trust Co. v. York,* 326 U.S. 99, 109–11, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945), together with the state's borrowing statute. *See Block v. First Blood Assocs.,* 988 F.2d 344, 349 (2d Cir.1993).

In determining the applicable state law, greatest weight is given to decisions of the forum state's highest court, in this case the New York Court of Appeals, the state's constitution and its statutes. *Erie,* 304 U.S. at 78, 58 S.Ct. at 822; *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir. 1994). Where an issue has not been decided definitively, the district court must predict how the highest state court would resolve the legal issue. *DeWeerth v. Baldinger,* 38 F.3d 1266, 1273 (2d Cir.1994); *Travelers Ins. Co.,* 14 F.3d at 119; *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. 1380, 1388–91 (E. & S.D.N.Y.1991), *rev'd in part on other grounds sub nom., In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.),* 971 F.2d 831 (2d Cir.1992).

"[G]reat weight" is given to "lower state court decisions," with decisions of "intermediate state appellate courts ... particularly persuasive." *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. at 1390. Nevertheless, federal district courts are not bound by lower state court precedents that they find probably would be rejected on appeal. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. at 1390.

## A. New York Statute of Limitations and Discovery Rule

### 1. Statute

New York's general limitations period for personal injuries is three years. N.Y.Civ. Prac.L. & R. § 214(5). Prior to 1986, the limitations period for harm caused by exposure to a toxic substance ran from the date of last exposure to the substance. *See Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 383, 568 N.Y.S.2d 550, 553, 570 N.E.2d 198, 201, *recons. denied,* 77 N.Y.2d 990, 571 N.Y.S.2d 916, 575 N.E.2d 402, *cert. denied,* 502 U.S. 868, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991); *Glod v. Morrill Press Div. of Engraph, Inc.,* 168 A.D.2d 954, 564 N.Y.S.2d 905, 907 (App. Div. 4th Dep't 1990). *But see Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 599 N.Y.S.2d 515, 615 N.E.2d 999 (1993).

In 1986, as part of a general "tort reform" package, the New York State legislature adopted a "discovery" rule for torts involving substances with latent effects. N.Y.Civ.Prac.L. & R. § 214–c. Under the new statute, the three-year limitations period runs from the time that the plaintiff discovered, or should have discovered, her "injury":

> [T]he three year period within which an action to recover damages for personal *injury* or injury to property *caused by the latent effects of exposure to any substance or combination of substances, in any form,* upon or within the body ... must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence *such injury should have been discovered* by the plaintiff, whichever is earlier.

*Id.* § 214–c(2) (emphasis added). As noted below, section 214–c(4) deals with the situation where scientific knowledge has not revealed which substance or substances might have caused the claimant's symptoms.

Claims based on torts committed before July 1, 1986, in which the "injury" was discovered or should have been discovered prior to that date, are time-barred if they were time-barred prior to July 1, 1986 and were not brought during a one-year window provided by the legislature. *Id.* § 214–c(6); L.1986, c. 682.

Another New York provision addresses the situation in which the plaintiff became aware of an "injury," but the state of scientific and medical knowledge initially prevented her

from ascertaining its cause. Such a plaintiff may file a claim within one year of discovering the cause, provided that discovery of the cause occurred within five years of actual or constructive discovery of the "injury" itself. The provision, New York Civil Practice Law and Rules section 214–c(4), states:

> [W]here discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to [section 214–c(2) ] the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of [section 214–c(2) ].

2. Awareness that "injury" was due to human cause

 a. Language of the statute

■ As developed more fully in Parts II. A.2.b–f, *infra*, sections 214–c(2) and 214–c(4) must be interpreted in the DES context to provide that discovery of the "injury" includes awareness not only of a medical problem, but that the difficulty resulted from a human rather than a natural cause. This result is required by the statute's use of the words "cause" and "injury" rather than "disease," or a synonym for that kind of etiology; the design and pattern of the statute; and the particular nature of latent injuries and toxic torts, as well as of scientific knowledge, that required section 214–c's adoption.

The legislative history of section 214–c and the courts' interpretation of the provision have been ambiguous, a matter discussed in Part II.A.2.b–d, *infra*. First, however, it is necessary to turn to the language of the provisions.

What must be "discover[ed]" under section 214–c(2) is "injury ... caused by ... exposure to any substance." The three operative words in the instant cases are "injury," "cause" and "substance." Read independently and together, they imply a human intervention that resulted in the medical difficulties alleged by these plaintiffs.

■ The sensible interpretation of the word "cause" here implies a human intervention. For example, the definition of "cause" in *Webster's New Twentieth Century Dictionary, Unabridged* (2d ed. 1979) reads in whole:

**cause,** *n.* [ME. *cause*; OFr. *cause*; L. *causa*, a cause, reason.]

1. a suit or action in court; any legal process which a party institutes to obtain his demand, or by which he seeks to realize his claim, lawsuit, case.

 The *cause* of both parties shall come before the judges.—Ex. xxii. 9.

2. that which produces an effect or result; that from which anything proceeds, and without which it would not exist.

 *Cause* is a substance exerting its power into act, to make a thing begin to be.—Locke.

3. a person or thing acting voluntarily or involuntarily as the agent that brings about an effect or result; as, a woman was the *cause* of his downfall.

4. a reason, motive, or ground for producing or trying to produce a given effect; as, *cause* for joy; *cause* for anger.

5. reason enough; as, *cause* for divorce.

6. any activity or movement that a number of people are interested in and support; as, slum clearance is a good *cause*.

7. any matter as a subject of discussion.

*efficient cause;* the power or agent that effects a result.

544

*final cause;* the purpose or end for which anything is produced.

*formal cause;* the ideal form according to which any thing or event is produced or brought about, as the form of a painting in the mind of any artist.

*material cause;* the means employed to produce a formal cause, as the oils, water colors, etc. used in a painting.

*to make common cause with;* to work together with toward the same objective; to form an alliance with.

**Syn.**—incitement, inducement, motive, origin, reason, source, purpose, object.

While the word "cause" standing alone may imply either a human or non-human antecedent, here, in a provision dealing with suits by persons against other persons, non-human agents are excluded from the meaning. It is the second and third of these definitions that are apropos. Note particularly Locke's combining of cause and substance "exerting its power ... to make a thing begin to be."

■ "Injury" also implies a human act rather than a natural progression. The definition reads

**in´ju· ry,** *n.; pl.* **in´ju· ries,** [ME. *injurie;* OFr. *injure;* L. *injuria,* wrong, an injury, an unjust act, from *injuriosus,* acting unjustly; *in* —priv., and *jus, juris,* right, justice.]

1. physical harm or damage to a person, property, etc.

2. unjust treatment; violation of rights; offense.

3. an injurious act.

4. insult. [Obs.]

**Syn.**—damage, hurt, harm, mischief, detriment, wrong, impairment.—*Damage* is that injury to a thing which occasions loss to a person or a diminution of value to a thing; *hurt* implies a wound inflicted physically or emotionally that destroys the soundness or integrity of things; *harm* suggests the causing of pain or distress; *mischief* suggests a

troublesome injury, that may simply produce inconvenience or annoyance. *Id.*

■ Substance, in this context, implies a human-made product rather than a naturally occurring defect or pathogen.

**sub´stance,** *n.* [L. *substantia,* essence, material, from *substare,* to be present, exist.]

1. the real or essential part or element of anything; essence; reality; matter.

2. *the physical matter of which a thing consists; material.*

3. (a) solid quality; substantial character; (b) consistency; body.

4. the real content of a statement, speech, etc.; true meaning; purport.

5. matter of a particular kind; stuff.

6. material possessions; property; resources; wealth.

7. in philosophy, the essence or substratum which underlies and is capable of having attributes or causing phenomena, but which in spite of changes in outward manifestation remains the same; that which really is or exists, as distinguished from its qualities, attributes, and the phenomena by which it is perceived.

8. in theology, the divine essence or personality, as considered common to each member of the Trinity.

The Son is said to be the same *substance* as the Father—that is, truly and essentially God as the Father is.—Eden.

*in substance;* (a) with regard to essential elements; substantially; (b) actually, really.

*Id.* (emphasis added).

This natural reading of the language used in the statute suggests that the drafters had in mind "discovery" of the fact that it was a toxic substance that led to the plaintiff's medical problem. The "injury" to plaintiff must be "caused" by a "substance" wrongfully produced by a prospective defendant or there can be, in the words of the statute, no "action to recover damages." That the defect in plaintiff's body was so caused by a

prospective defendant is the raison d'être of the statute.

█ As developed in more detail below, if a person has a medical problem, unless she has good reason to conclude that, contrary to the usual course of events, a human-made product led to the difficulty, she has not "discovered" that it was "caused." The few precedents, none of which are from the New York Court of Appeals, must be examined in light of this fundamental sense of section 214–c in DES cases.

b. Precedents

"Discovery" of an "injury" under section 214–c(2) does not necessarily occur at the "'first onset of symptoms.'" *Michael v. Ametelco, Inc.,* 150 Misc.2d 507, 568 N.Y.S.2d 1003, 1005 (Sup.Ct. Monroe County), *aff'd sub nom., Michael v. Eastern Alloys, Inc.,* 175 A.D.2d 667, 573 N.Y.S.2d 945 (App.Div. 4th Dep't), *appeal denied,* 78 N.Y.2d 862, 578 N.Y.S.2d 877, 586 N.E.2d 60 (1991). "Injury" does not include "any symptom however trivial." *See Griffin v. Garratt–Callahan Co.,* No. CV–94–0395, 1995 WL 151824, at *3 (E.D.N.Y.1995); *see also Mesa v. United Nations Dev't Corp.,* 157 Misc.2d 362, 596 N.Y.S.2d 1012, 1014 (Sup.Ct.N.Y.County 1993). One court explained that "'injury' ... refer[s] to an actual illness, physical condition or other similarly discoverable manifestation of the damage caused by previous exposure to an injurious substance." *Sweeney v. General Printing Co.,* 210 A.D.2d 865, 621 N.Y.S.2d 132, 133 (App.Div. 3d Dep't 1994).

Although the New York Court of Appeals has not ruled on the issue, a number of federal and lower state cases have opined that, under section 214–c(2), a plaintiff need not be aware of the "cause" of her symptoms to be held to have "discovered" her "injury." *See, e.g., Sweeney,* 621 N.Y.S.2d at 133; *Johnson v. Ashland Oil, Inc.,* 195 A.D.2d 980, 601 N.Y.S.2d 756, 757 (App.Div. 4th Dep't 1993); *Michael,* 568 N.Y.S.2d at 1007; *Wallen v. American Telephone & Telegraph Co.,* Index No. 12336/91 (N.Y.Sup.Ct.Bronx County Sept. 17, 1992), *aff'd,* 195 A.D.2d 417, 601 N.Y.S.2d 796 (1st Dep't), *appeal denied,* 82 N.Y.2d 659, 605 N.Y.S.2d 5, 625 N.E.2d 590 (1993); *Griffin,* 1995 WL 151824, at *3 (citing *Sweeney* and *Johnson*); *Adams v. Key Tronic Corp.,* No. 94–CV–0535 (MEL), 1994 WL 594779, at *1 (S.D.N.Y. Oct. 31, 1994) (citing *Wallen*).

These restrictive precedents have been relied upon by the Supreme Court, New York County, in dismissing DES claims on statute of limitations grounds. *See, e.g., Culpepper v. Eli Lilly & Co.,* Index No. 115878/93, slip op. at 2 (N.Y.Sup.Ct. N.Y.County Mar. 14, 1995) (unpublished); *Wetherill v. Eli Lilly & Co.,* Index. No. 22566/92, slip op. at 3–8 (N.Y.Sup.Ct. N.Y.County Oct. 12, 1994) (unpublished); *Indovino v. Abbott Lab.,* Index No. 21581/91, slip op. at 4 (N.Y.Sup.Ct. N.Y.County Aug. 11, 1993) (unpublished); *Horton v. Eli Lilly & Co.,* Index. No. 26321/92, slip. op. at 4–5 (N.Y.Sup.Ct. N.Y.County July 29, 1993) (unpublished). As demonstrated below, it is unlikely that the New York Court of Appeals will adopt this narrow view of applicable law to bar otherwise valid DES claims.

Independent of, and separate from, a plaintiff's awareness of the fact that she is medically impaired must be her awareness that her medical problem was "caused" by something extrinsic to her biology—that someone has done something to her. A plaintiff may only discover aspects of her claim in pieces: (1) the fact that she has a medical problem; (2) the fact that the problem has a human cause; (3) the nature of the injurious agent (e.g., drug, gas, etc.); (4) the specific identity of the injurious agent (e.g., DES, asbestos); and (5) the fact that someone or some entity was liable, in some way, in connection with marketing, producing or distributing the causative agent.

The instant cases require that the plaintiffs be aware of (1) and (2) at minimum. It is not necessary to address the need for knowledge of (3), (4) and (5) under the statute in the context of these particular DES cases since in each case knowledge of (1) and (2) would almost certainly have led directly to knowledge of (3), (4) and (5). Since each plaintiff knew she was a DES daughter, once she knew her medical problem was caused by human intervention in the form of a manufac-

tured product she should have realized DES and its manufacturers were responsible.

Published precedents have not considered this hierarchy of discovery in construing section 214–c. Except for one unpublished opinion, the cases have not addressed the dichotomy of human versus natural causative agents critical to the instant litigations. The one unpublished opinion of which the court is aware is that of a highly respected New York trial court, *Horton v. Eli Lilly & Co., supra.* It rejected in dictum "plaintiff's argument that some factual knowledge of wrongdoing by a third party is necessary to start the running of [N.Y.Civ.Prac.L. & R. § 214–c]." *Id.,* slip op. at 6.

■ In a DES case, New York policy requires that section 214–c(2) be construed as triggering the statute of limitations, at the earliest, on a plaintiff's reasonable discovery of 1) her medical problem *and* 2) the fact of its human causes. Discovery under the statute occurs at the point in time that a plaintiff becomes aware, or should have become aware, that her disease or other medical problem was caused by something extrinsic to her biological system—i.e., that it did not just "happen." The basis for this conclusion is discussed in Part II.A.2.e, *infra.*

What follows, first, is a discussion of the basis for the few court interpretations of the New York statute. These interpretations are overly restrictive. The wording of the statute, and the legislative design, do not foreclose sensible construction of "discovery of injury" to require a plaintiff's awareness of both her medical problem and its human cause.

### c. Comparison of sections 214–c(2) and 214–c(4)

The restrictive construction adopted in non-New York Court of Appeals decisions is based upon a comparison of section 214–c(2) and section 214–c(4). For reasons explained below, that comparison is not persuasive on the issue of whether "discovery" of an "injury" should be construed to require discovery of some aspect of the injury's "cause."

According to these restrictive decisions, section 214–c(4) exists to prevent an otherwise harsh result where the cause of the plaintiff's medical problem was temporarily unknowable due to the state of scientific knowledge at the time the problem was discovered. Reading section 214–c(2)'s reference to "discovery of injury" to mean "discovery of the cause of the injury," they suggest, would render section 214–c(4) redundant. To prevent the apparent redundancy, a few New York cases have held, in effect, that section 214–c(4) creates a narrow exception to the general rule in section 214–c(2) that knowledge of any aspect of cause is not required for the statute of limitations to begin to run. *See Michael,* 568 N.Y.S.2d at 1007 ("If the term injury encompassed causation, that is, if injury were to be defined as an illness or disease believed or suspected to be caused by toxic substance exposure, ... the limitations provisions of subdivision 4 would not be necessary"); *see also Sweeney,* 621 N.Y.S.2d at 133 (construction of 214–c(2) and 214–c(4)); *Johnson,* 601 N.Y.S.2d at 757 (same).

■ In fact, construing "discovery of injury" in section 214–c(2) to require plaintiff's awareness of both her medical problem and its cause would not render section 214–c(4) redundant. Both provisions are needed to ensure full recovery in the not uncommon situation where a plaintiff's medical problems are caused by synergistic or confounding effects of two or more substances. Due to the then-existing state of scientific knowledge, a plaintiff may only have been aware of one of several substances that "caused" her medical problems at the time that she first filed a suit timely under section 214–c(2). As scientific knowledge evolves, section 214–c(4) ensures that a plaintiff who later discovers—through new scientific information—that other defendants' delicts or substances are implicated will not unreasonably be denied recovery on the ground that an action against the newly discovered defendants is barred by 214–c(2).

It is typical in medical problems associated with exposure to toxic substances for scientists to establish over time the presence of several substances or agents acting in combination. *See, e.g., Cantrell v. GAF Corp.,* 999 F.2d 1007, 1013 (6th Cir.1993) (synergy between smoking and asbestos in causing plaintiffs' medical problems); *Ingram v. Acands,*

*Inc.*, 977 F.2d 1332, 1342 (9th Cir.1992) (similar); J. Morelli & Orna Harish, *Establishing Causation in Contamination Cases,* N.Y.L.J., June 12, 1995, at S4 (need for experts in "medico-legal" cases to consider synergies implicated in plaintiffs' medical problems); *cf. Citizens for a Better Env't v. Reilly,* No. 85 C 8000, 1991 WL 95040 (N.D.Ill. May 24, 1991) (practical difficulties of testing synergistic effects of chemical substances).

The statute, by its terms, recognizes the potential synergism in medical problems due to toxic exposure. Section 214–c(2) is explicitly worded to govern "an action to recover damages for personal injury ... caused by the latent effects of exposure to any substance *or combination of substances,* in any form, upon or within the body." N.Y.Civ. Prac.L. & R. § 214–c(2) (emphasis added). Without section 214–c(4) a plaintiff could be barred from suing under 214–c(2) before new scientific data implicating other substances had even been developed.

The whole picture of a class of injuries may emerge only gradually, as more and more information about individual cases—the length and the duration of the exposure, the context of the exposure, the presence of confounding environmental factors, and the like—is collected and processed. Scientific discovery tends to be incremental; instantaneous global comprehensive solutions are rare. *Cf.* Phyllida Brown & David Concar, *HIV Epidemic Threatens Asia's Developing Nations,* New Scientist, June 22, 1991, at 18 (" 'Science does not work in breakthroughs. It works in small, incremental steps.' " (quoting Anthony Fauci, Director, U.S. Nat'l Inst. for Allergy and Infectious Disease)). Scientific information required to evaluate the basis of a claim may not be always available at the time that it is needed, or in the form that is desired. *See The Lesson of Mass Tort Litigation in the United States: The Need for Consistency and Cooperation in the Utilization of Scientific Evidence by the Courts,* F.U.S.–E.C. Leg.–Econ.Aff. 13–18 (Mentor Group, Boston, 1995) (on file in these cases). For example, even in the asbestos cases, where the scientific bases of asbestos-caused lung diseases have been long known, *see In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken),* 129 B.R. 710, 734–51 (E. & S.D.N.Y.1991), *vacated on other grounds,* 982 F.2d 721 (2d Cir.1992), *modified on reh'g,* 993 F.2d 7 (2d Cir.1993), scientific information is still being developed on whether colon cancer can be or is caused by exposure to asbestos. *See In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124 (2d Cir.1995).

The two provisions in section 214–c must be read as an intelligent and thoughtful accommodation to the nature of many plaintiffs' injuries—particularly the potential for multiple causes—and to the incremental nature of scientific discovery. Under this sensible reading, it is assumed that a plaintiff who discovers her "injury" and its cause, to the extent possible given the then-current state of scientific knowledge, will file suit in a timely fashion as provided by section 214–c(2). If she later discovers additional causes that were scientifically unknowable to her at the time she first filed suit, she may proceed under section 214–c(4), provided that provision's other requirements are met. Without section 214–c(4), the words "combination of substances" in section 214–c(2) could bar, on statute of limitations grounds, suits against those responsible for the newly identified causative agent or agents.

Section 214–c(4) is a compromise approach, rather than a guarantee of full recovery. While that provision provides for suits filed within a year of plaintiffs' discovery of previously scientifically unknowable causes, it also mandates that such suits be filed within five years of discovery of the "injury." It must be assumed that "discovery of the injury" under section 214–c(4) means the same thing as "discovery of the injury" under section 214–c(2).

#### d. Legislative design

The legislative record is inconclusive on the issue of whether "discovery" was intended to encompass merely knowledge of the medical problem, or knowledge of the medical problem together with its cause. One source of information is the text of the bills that preceded the final, enacted, version. Another basis for interpretation is the discussion of the final version of the bills in the

State Senate and Assembly that preceded enactment.

The different approaches adopted in Senate and Assembly versions of the bills that preceded enactment of the discovery rule do not establish that the legislature considered and rejected knowledge of the "injury's" cause, even in its broadest sense, as a component of "discovery" under section 214–c(2). *See generally* Steven L. White, Note, *Toward a Time-of-Discovery Rule for the Statute of Limitations in Latent Injury Cases in New York State,* 9 Fordham Urban L.J. 113, 154–57 (1985). On March 12, 1984, the Assembly passed a bill, A. 3547–A, which would have explicitly provided for accrual on plaintiff's discovery of her "disability" and its "cause[ ]" by exposure to a toxic substance:

> [W]here the injury or illness is damage to the respiratory system or other system, part or function of the body caused by exposure to a substance, material, element or particle, the effects of such exposure being latent and not manifested upon exposure, the time for commencement of an action or proceeding to recover damages for such injury or illness shall be the latter of the following:
>
> 1. within two years after the date the plaintiff first suffered disability; or
>
> 2. within two years after the date *the plaintiff discovered that such disability was caused or contributed to by such exposure.*

*See* White, *supra,* at 154–55 & n. 262 (emphasis added). A different version of a time-of-discovery bill, S. 9158, drafted by Senator Ronald B. Stafford and considered in a Senate committee in May of 1984 did not explicitly require plaintiffs' knowledge of the causes of their medical problems for the statute of limitations to run; in addition, it added a "reasonable diligence" standard:

> [A]n action to recover damages for personal injury or injury to property caused by the latent effects of exposure to a toxic or harmful substance may be commenced within two years from the date of discovery of the injury or within two years from the date when through the exercise of

reasonable diligence such injury should have been discovered, whichever is earlier. *See* White, *supra,* at 156 & n. 267.

The differences between these two precursors to section 214–c, and the apparent dominance of S. 9158 in the final, enacted product, while arguably supportive of a restrictive interpretation, does not negate the natural reading of the language of the statute. The drafters could well have concluded that the language, "plaintiff discovered that such disability was caused or contributed to by such exposure," was unnecessary—that the concept "discovery," in context, included plaintiff's awareness of her "injury" and its cause by the latent effects of toxic substances. Such a natural reading would have made the Assembly's language redundant and unnecessary.

Discussions of the final version of the "discovery rule" in the legislature that preceded its enactment suggest that the statute's drafters were concerned that New York was out of the mainstream in its handling of medical problems caused by the latent effects of harmful products, and sought to bring New York into line with other jurisdictions. *See New York State Assembly Debate Transcript,* Bill No. 10,664, June 24, 1986, at 60–93 (N.Y.Legis.Serv.); *New York State Senate Debate Transcript,* Chapter 682, at 5145–54 (N.Y.Legis.Serv.). In his concluding remarks in support of adoption of the discovery provision, Senator Stafford (who, as noted above, was responsible for the less explicit Senate version ultimately adopted) emphasized the need to bring New York State into the mainstream: "And, finally," he pointed out, "over 40 states have this legislation, and we feel that New York should be one of them." *See Senate Transcript, supra,* at 5151.

In a memorandum approving the bill, the Governor echoed the legislature's expectation that the discovery provision would bring New York into the mainstream:

> This bill ... repeals th[e] anarchic rule[, under which suit had to commence within three years of exposure to the substance,] and replaces it with a fair and simple rule which permits a person to discover his or her injury before the statutory time period

for suit begins to run. *In enacting this law, New York joins more than 40 other states which have legislatively or judicially created a statute of limitations discovery rule.*

*Governor's Memorandum filed with Senate Bill Number 9391–A* (July 30, 1986), *in Governor's Bill Jacket*, Chapter 682, 1986 (N.Y.Legis.Serv.) (emphasis added).

In contrast, the construction advanced by defendants would make New York's discovery rule the most restrictive in the nation. As described by the federal district court for the District of Columbia, a generic discovery rule requires actual or constructive knowledge of both the "injury" and its cause; the role of wrongdoing in bringing about the "injury" is implied in the term "cause."

In general, discovery rules are adopted to avoid the unfairness of interpreting a statute of limitations to accrue when the injury first occurs, if at that time plaintiff does not have enough information to bring suit. This policy is applied to different factual situations as they arise. Where the injury is latent, the claim is held not to accrue until the plaintiff discovers the injury. Where causation of an injury is unknown, the action accrues when both the injury and its cause have been (or should have been) discovered. Where the injury and causation are known, but not that there has been any wrongdoing, the action is held to accrue when the plaintiff discovered, or by due diligence should have discovered, the wrongdoing. . . . While a few courts have forthrightly rejected some or all of these interpretations, most have at least phrased their discovery rules in a manner that could allow such interpretations should an appropriate case arise.

*Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330, 1338 (D.D.C.1982). *See also, e.g., Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1112, 751 P.2d 923, 928, 245 Cal.Rptr. 658, 663 (1988) (DES case; limitations period triggered when plaintiff knows of her injury, its cause, and has a "suspicion of wrongdoing"); *In re Asbestos Litig. West Trial Group*, 622 A.2d 1090, 1093 (Del.Super.Ct.New Castle County 1992) (asbestos case; "Under the discovery rule, the statute of limitations does not begin to run until the plaintiff is chargeable with the cause of her injury."); *Dawson*, 543 F.Supp. at 1338 (DES case; applying District of Columbia law to hold that the limitations period is triggered when plaintiff is aware of her injury, its cause, and the presence of wrongdoing), *cited with approval in, Bussineau v. President & Directors of Georgetown College*, 518 A.2d 423, 425 (D.C.1986), *reh'g denied*, 525 A.2d 595 (D.C.), *recons. denied*, 532 A.2d 89 (D.C.1987); *Colon v. Celotex Corp.*, 465 So.2d 1332, 1334 (Fla.Dist.Ct.App. 1985) (asbestos case; limitations period triggered when plaintiff "knew or should have known ... that he had a cause of action against the defendants"), *quashed on other grounds, Celotex Corp. v. Meehan*, 523 So.2d 141 (Fla.1988); *Anderson v. Sybron Corp.*, 165 Ga.App. 566, 567, 353 S.E.2d 816, 817 (Ct.App.) (cataracts caused by exposure to ethylene oxide; limitations period triggered when plaintiff "knew or through the exercise of reasonable diligence should have discovered not only the nature of his injury but also the causal connection between the injury and the alleged negligent conduct of [the defendant]"), *aff'd*, 251 Ga. 593, 310 S.E.2d 232 (1983); *Nolan v. Johns–Manville Asbestos*, 85 Ill.2d 161, 421 N.E.2d 864, 868–69, 52 Ill.Dec. 1, 5–6 (1981) (asbestos case; limitations period triggered when plaintiff learns of injury and fact that it was "probably" caused by someone else's wrongdoing); *Louisville Trust Co. v. Johns–Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky.1979) (asbestos case; limitations period triggered when plaintiff learns of injury and fact that it was caused by defendant's conduct); *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 207, 557 N.E.2d 739, 742 (1990) (DES case; "[P]laintiff [must] have (1) knowledge or sufficient notice that she was harmed and (2) knowledge or sufficient notice of what the cause of her harm was."); *Moll v. Abbott Lab.*, 444 Mich. 1, 23–24, 506 N.W.2d 816, 827–28 (1993) (DES case; limitations period is triggered when plaintiff is aware of her injury and its "possible" cause); *Elmore v. Owens–Illinois, Inc.*, 673 S.W.2d 434, 436 (Mo.1984) (en banc) (asbestos case; cause of action for asbestosis accrued when, on diagnosis, plaintiff became aware of both the "character of the condition (asbestosis) and its cause (breathing asbestos

dust)"); *Sawtell v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 248, 252 (10th Cir.) (medical products liability case; applying New Mexico law to hold that plaintiff's claim was time-barred, where plaintiff had long known of her injury and of its "specific cause"), *cert. denied*, —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994); *Burgess v. Eli Lilly & Co.*, 66 Ohio St.3d 59, 60, 609 N.E.2d 140, 141 (1993) (DES case; construing statute of limitations in context of state constitution's "right-to-remedy" clause to hold that "[a] cause of action based upon DES exposure accrues only when the plaintiff has been informed by competent medical authority that she has been injured by DES, or upon the date on which, by exercise of reasonable diligence, she should have known that she has been so injured"); *Baumgart v. Keene Bldg. Prods. Corp.*, 430 Pa.Super. 162, 171, 633 A.2d 1189, 1193 (Super.Ct.1993) (asbestos case; limitations period is triggered when plaintiff is aware of his injury and its cause, or where the " 'the information, through the exercise of due diligence, was knowable to the plaintiff' "); *Burnside v. Abbott Lab.*, 351 Pa.Super. 264, 291, 505 A.2d 973, 977–78 (Super.Ct.1985) (DES case; statute of limitations period triggered when plaintiff "knows or reasonably should know" the fact of her injury and " 'who or what caused it' "); *Anthony v. Abbott Lab.*, 490 A.2d 43 (R.I.1985) (DES case; "[I]n a drug product-liability action where the manifestation of an injury, the cause of that injury, and the person's knowledge of the wrongdoing by the manufacturer occur at different points of time, the running of the statute of limitations would begin when the person discovers, or with reasonable diligence should have discovered, the wrongful conduct of the manufacturer."); *Reichelt v. Johns–Manville Corp.*, 42 Wash. App. 620, 712 P.2d 881 (App.1986) (asbestos case; limitations period triggered when plaintiff discovers, or should have discovered "all the essential elements of his cause of action," including the fact of his injury, the injury's cause by a defective product and the identity of the manufacturer), *aff'd in part, rev'd in part on other grounds*, 107 Wash.2d 761, 733 P.2d 530 (1987); Michael A. Pretl & Heather A. Osborne, *Trends in US Drug Product Liability—The Plaintiff's Perspective, in Product Liability, Insurance and the Pharmaceutical Industry: An Anglo–American Comparison* 109, 117 (Geraint G. Howells ed., 1991) "The discovery rule takes several forms among the different states, moving slowly toward a standard whereby the plaintiff must appreciate not only the causal relationship of the product to the injury but also product defect or manufacturer wrongdoing, before the action is barred." (citing Vinson & Slaughter, *Products Liability: Pharmaceutical Drug Cases* § 3.01 *et seq.* (1988)); *cf. Hadden v. Eli Lilly & Co.*, 208 N.J.Super. 716, 720, 506 A.2d 844, 846 (Super.Ct.App.Div.) (DES case; "The discovery rule permits deferral of the accrual of a cause of action until the injured person knows or should know that he has sustained an injury or knows or should know that an injury of which he is aware is attributable to the fault of another person."), *certification denied*, 104 N.J. 441, 517 A.2d 431 (1986); *Cavanaugh v. Abbott Lab.*, 145 Vt. 516, 496 A.2d 154 (1985) (DES case; adopting discovery rule and declining to reach issue of whether knowledge of the cause is required to trigger the statute of limitations, where plaintiff's claim was timely in any event).

Of those jurisdictions that have not considered discovery rules in the specific context of latent injuries, many have adopted discovery rules for products liability and personal injury actions that require knowledge of both the medical problem and its cause. *See* 54 Corpus Juris Secundum § 167, at 215 & n. 96 (1986) and cases cited therein; *id.* § 169, at 218–19 & nn. 41–42 and cases cited therein. *But cf. Condon v. A.H. Robins Co.*, 217 Neb. 60, 68, 349 N.W.2d 622, 627 (1984) (IUD case; "Discovery ... refers to the fact that one knows of the existence of an injury or damage and not that one knows he or she has a legal right to seek redress in the courts.").

■ As these cases demonstrate, the American rule of discovery for statute of limitations purposes requires knowledge—or its handmaiden, reasonable diligence in obtaining such knowledge—both of the "injury" and its unnatural cause. The legislature and Governor must have had this rule in mind when they adopted section 214–c. A question left unanswered in the discussion pre-

ceding adoption of section 214–c, and elsewhere in the meager legislative history, is how far into the mainstream the legislature wanted to bring New York's handling of these issues.

### e. Policy

██ Given the arguably ambiguous language of the statute and the lack of clear legislative design, policy must guide construction of the statute. Policy dictates that in construing statutes of limitations, plaintiffs should not unreasonably be denied recovery and defendants should not have to litigate stale claims. *See Duffy v. Horton Memorial Hosp.*, 66 N.Y.2d 473, 476–77, 497 N.Y.S.2d 890, 892–93, 488 N.E.2d 820 (1985) ("[T]he primary purpose of a limitations period is fairness to a defendant.... There is also the need to protect the judicial system from the burden of adjudicating stale and groundless claims." (citations omitted)); *Rothstein v. Tennessee Gas Pipeline Co.*, 204 A.D.2d 39, 616 N.Y.S.2d 902, 904 (App.Div. 2d Dep't 1994) (remedial nature of section 214–c requires liberal construction).

██ Turning to the policy favoring plaintiffs' reasonable recovery for injuries suffered at the hands of malefactors, the guiding principle is that plaintiffs should not be penalized for failing to bring an action where they lacked information about the human source of their medical problems through no fault of their own. In the absence of determinative legislative history, the question of how much practical effect to give to this guiding principle is left to the courts. Plaintiffs' reasonable awareness of the role of a human element in their medical problems is the minimum requirement for "discovery" under the statute. *Cf. Schwartz v. Heyden Newport Chem. Corp.*, 12 N.Y.2d 212, 219, 237 N.Y.S.2d 714, 719, 188 N.E.2d 142, 145 (1963) ("[I]t would be unreasonable and perhaps unconstitutional to hold that [plaintiff's] time to sue expired before it was possible for him to learn of the wrong....") (Desmond, C.J., and Fuld, J., dissenting) (citations omitted), *cert. denied*, 374 U.S. 808, 83 S.Ct. 1697, 10 L.Ed.2d 1032 (1963).

A plaintiff who is aware that she has a medical problem, but who does not know that it resulted from a human cause, is, as a practical matter, in no better position to file suit than a plaintiff who does not know that she has a medical problem. Where a plaintiff's ignorance about the human cause of her problems is reasonable and due to no fault of her own—*either* because such information was once unknowable, *see* N.Y.Civ.Prac.L. & R. 214–c(4), *or* because of other factors to be considered in a moment—it is both inconsistent with the guiding principle and cruel to start the limitations clock ticking on the mere manifestation of a medical problem.

A plaintiff's lack of awareness about the human causes of her medical problem may be faultless independent of the scientific "knowability" of those causes. A layperson normally does not think of "diseases" or their manifestations as "injuries," but rather as acts of nature. Unlike a plaintiff who is run down by a truck and immediately knows the cause of her "injury," a plaintiff exposed to a toxic substance may feel ill without knowing of her exposure or its role in her long-latent illness.

While paranoia is widespread, the law does not build upon it to demand that ill people assume that every medical problem that they suffer resulted from the intervention of a malefactor. The public may reasonably assume the best rather than the worst about the pharmaceutical industry.

Plaintiffs should not be penalized for reasonably failing to assume a tortious basis for their medical problems and for not commencing an impossible and hypothetical suit against an unsuspected, unknown someone. Despite claims of excessive litigiousness, current studies indicate that most people who might have been injured by a tortfeasor do not sue because, reasonably, they have faith in our manufacturers' and professionals' competence; they do not automatically assume that their problems resulted from misfeasance. *See* Harvard Medical Malpractice Study, *Patients, Doctors, and Lawyers: Medical Injury, Malpractice Litigation, and Patient Compensation in New York* (1990); Deborah R. Hensler et al., *Compensation for Accidental Injuries in the United States* (RAND, R–3999–HHS/ICJ, 1991); *Individu-*

*al Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices* 9–10 (Northwestern Univ. Press 1995).

Especially where a disease is prevalent in the nonexposed population, a plaintiff may need to know more than her symptoms, or a medical diagnosis, to realize that her medical problem has a human cause. Not all manifestations of exposure to latent toxic substances are "signature diseases"—i.e., those that occur almost exclusively in connection with exposure to a particular substance. An example is sterility, which may arguably be caused by DES but which is common in the nonexposed population. It is, in fact, defendants' position in the instant cases that scientific knowledge even now does not support a conclusion that plaintiffs' sterility was caused by DES.

In *Dawson v. Eli Lilly & Co., supra,* the district court for the District of Columbia explained the rationale for such an appropriate construction consonant with that required for section 214–c:

Since the purpose of a discovery rule is to prevent the accrual of a cause of action before a plaintiff can reasonably be expected to know that he has a cause of action, the statute should not begin to run until he knows, or through the exercise of due diligence, should know, that this injury *is the result of someone's wrongdoing.*

543 F.Supp. at 1334 (applying District of Columbia law, and describing similar approaches in Colorado, Hawaii, Illinois, Michigan, New Hampshire, New Jersey, Pennsylvania, Washington and West Virginia law) (emphasis added); *see also Anthony,* 490 A.2d at 46 ("[I]n what we see as an emerging trend, several courts have concluded that plaintiff should have knowledge of some wrongdoing by the drug manufacturer before the statute begins to run under a discovery rule."). To say that a plaintiff knows she must sue someone by a certain date even though she reasonably does not know that someone was responsible for her medical problem is to add an unnecessary legal cruelty to the one already physically imposed by the anonymous harmdoer.

It is reasonable for a jury to conclude that a woman will suspect that her problem stems from genetic or other non-fault based difficulties, rather than from human intervention. These are considerations particularly understood by our representative jurors whose practical common sense reflect the wisdom of a consensus of the community's cross section. Where a plaintiff's belief that her medical problems are based on some organic process is reasonable, it would subvert the statute's purpose to automatically cut off her claims on the ground that the manifestations of a particular toxicological hazard might be discoverable.

These arguments have particular force in the DES context. A DES daughter's initial ignorance that her problems resulted from a human-made substance may be particularly reasonable and blameless. DES daughters' encounters with the drug typically preceded development of "discoverable" medical problems by decades. The substance causing the harm was imbibed by the mothers before plaintiffs were born.

Consider the plaintiff who knows she is sterile, but who does not know that DES, rather than some genetic abnormality, is responsible. If her assumption that her problem arose from "natural" causes rather than from defendants' DES is reasonable, then to hold her to have discovered an "injury" when she first learns that she is sick, diseased or physiologically impaired is to penalize her for her lack of information that was due to no fault of her own. To hold that the legislature intended such unknowing victims to be denied recovery is to find that it displayed a chimera of hope and compassion while blocking redress.

The New York Court of Appeals has previously acknowledged the unique problems faced by DES daughters; it has demonstrated its willingness to act dramatically to remove unreasonable procedural barriers to suit encountered by such plaintiffs. *See Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *see also Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 568 N.Y.S.2d 550, 553–54, 570 N.E.2d 198, 201–02, *recons. denied,* 77

N.Y.2d 990, 571 N.Y.S.2d 916, 575 N.E.2d 402, *cert. denied,* 502 U.S. 868, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991) (explaining *Hymowitz,* discussed *infra* ). *Hymowitz* is the polar star guiding a federal court's prediction that the state's highest court would construe section 214–c(2) realistically to allow those injured by DES an effective opportunity to seek legal relief. Justice, the New York high court held, required the law to provide for market share liability where a plaintiff is unable to identify the manufacturer of the DES ingested by her mother.

A narrow, rigid and technical interpretation of section 214–c(2) may appeal to attorneys trained to argue the law, and judges charged with applying it. They must, nonetheless, in the interest of giving words their natural meanings to affect conduct of reasonable living people, consider limits of knowledge and emotional aspects of real-world ratiocination. Plaintiffs living in a maelstrom of hurt, anger and denial after a diagnosis of sterility or other reproductive problem cannot be expected to act with cold and omniscient rationality, as a lawyer or judge might with the benefit of hindsight in sheltered chambers. An "injury" may so shock and confuse a reasonable woman's central being as to prevent her from appreciating the reason for her condition sufficiently to permit legal action. Plaintiffs' reasonable and explicable delay in absorbing the fact that human intervention, rather than nature, caused their medical problems—as well as the absence of available scientific data—are factors that must be considered in construing the applicable statutes of limitation and in deciding what is reasonable for a prospective plaintiff.

Turning to the policy against requiring defendants to litigate stale claims, defendants are not unduly burdened by construction of "discovery" that requires awareness of both the medical problem and the fact that it was caused by human intervention. Such a construction does not delay accrual indefinitely, but only as necessary for a *reasonable* plaintiff to discover the fact of her medical problem and that someone is responsible. A fact finder in the DES cases might well find that a plaintiff's awareness of her DES exposure, coupled with local or national media coverage of DES-related medical problems and culpable manufacturers, should have put her on notice earlier that some or all of her medical problems resulted from human causes.

#### f. Likely New York Court of Appeals' construction

In light of the reasons supporting a logical construction, the absence of a clear evidence of legislative intent in the area, the remedial nature of the statute, and the Court of Appeals' demonstrated sensitivity to DES daughters' unique posture *viz* procedural barriers, it is reasonable to assume that New York's highest court would construe section 214–c(2)'s reference to "discovery" to require plaintiff's awareness of both her medical problem and its cause by some human intervention. It is highly doubtful that the same pacesetting Court of Appeals which, in 1989, dramatically changed the law to permit plaintiffs' recovery in DES cases would, in 1995, regressively cut off plaintiffs' claims by unnecessarily adopting the harshest possible construction of the discovery rule.

In the instant cases, once each plaintiff became aware that her medical problem was not "natural" but was caused by a drug, she would have had to conclude that the human-made product DES was the cause. Each plaintiff knew that she was a DES daughter but, allegedly, not the full panoply of medical problems that DES could cause.

In other contexts, there may be knowledge that a human-made substance "caused" the defect without knowledge of who or what caused it. There is no need in the present DES cases to determine whether the statute requires knowledge of which person or substance caused the disease. Here it is enough to know that it had a human cause. Neither is it necessary in the present cases to pinpoint exactly when the injury occurred in order to construe section 214–c's discovery rule. *Cf. In re "Agent Orange" Prod. Liability Litig.,* 996 F.2d 1425, 1433–34 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994) and —— U.S. ——, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994); *Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1389 (E.D.N.Y.1988).

The Court of Appeals' decision against plaintiffs in *Jensen v. General Electric Co.,*

82 N.Y.2d 77, 603 N.Y.S.2d 420, 623 N.E.2d 547 (1993), does not support a narrow construction of section 214–c in the DES context. In that case, while acknowledging section 214–c's remedial nature, the Court of Appeals held that section 214–c's enactment displaced common-law theories of continuing trespass and nuisance. Plaintiffs, who had long known of their "injury" and of defendants' role, sought to recover for property damage stemming from defendants' disposal of hazardous waste at a nearby site several decades earlier. Application of continuing trespass or nuisance doctrines, theories developed to mitigate the harshness of the old regime, would have extended plaintiffs' time to file long beyond the point at which they had learned of their environmental problem and its cause.

In contrast to *Jensen*, the instant cases do not pose the question of whether old doctrine survives enactment of a statute, section 214–c, that arguably made the common law superfluous. Rather, the problem is how to construe 214–c in light of the legislature's modern approach to plaintiffs' problems. Unlike the plaintiffs in *Jensen*, the DES daughters in the instant cases do not seek to extend the statute of limitations beyond the period that they reasonably became aware that human intervention caused their medical problems.

Nor does the Court of Appeals' refusal to alter traditional tort liability principles to permit recovery by DES granddaughters suggest that it would take a narrow view of the problem presented in the instant cases. *See Enright v. Eli Lilly & Co., supra.* In *Enright*, the Court explained that while DES daughters' unique problems required alteration of the law as necessary to ensure that unreasonable "procedural barriers" would not prevent recovery, *see Hymowitz, supra,* their situation did not require alteration of the substantive law of torts on proximate cause:

> To be sure, recent developments demonstrate legislative and judicial solicitude for the victims of DES, but they do not establish DES plaintiffs as a favored class for whose benefit all traditional limitations on tort liability must give way. To the extent

that special rules have been fashioned, they are a response *to unique procedural barriers and problems of proof peculiar to DES litigation.*

*Enright*, 568 N.Y.S.2d at 553–54, 570 N.E.2d at 201–02 (emphasis added); *see also Anderson v. Eli Lilly & Co.,* 79 N.Y.2d 797, 580 N.Y.S.2d 168, 170, 588 N.E.2d 66, 68 (1991) (holding, in DES case, that section 214–c's enactment did not alter substantive law preventing recovery for loss of consortium where tortious conduct and resultant injuries occurred prior to marriage).

The decision in the instant cases, even more than in *Hymowitz* (as characterized in *Enright*), does not require modification of traditional tort liability principles or creation of new causes of action. What is at stake is construction of section 214–c(2) consistent with the legislature's language in a way that does not unnecessarily erect unreasonable "procedural barriers" to DES plaintiffs' recovery.

### B. Standard of Constructive Knowledge

An issue in applying New York's discovery rule is what standard of "constructive knowledge" to apply. The test applied must be that of a reasonable person in plaintiff's specific position, given her emotional state and personal resources. *Compare Anthony v. Abbott Lab.,* 490 A.2d 43, 48 (R.I. 1985) (holding, in DES case, that "the statute shall start running when a reasonable person in circumstances similar to plaintiff['s] would have discovered a defendant's wrongful conduct.... an objective as well as subjective standard") *with Moll v. Abbott Lab.,* 444 Mich. 1, 16–18, 506 N.W.2d 816, 823–25 (1993) (rejecting, in DES case, "subjective" standard in construction of discovery rule); *cf. Bliss v. Commissioner of Internal Revenue,* 59 F.3d 374, 375–76 (2d Cir.1995) (innocent spouse exception for spouse's tax liability "applies to an individual ... who does not know of the understatement, and *who is not equipped by education or financial expertise,* or alerted by unusual or lavish expenditures, to see through the deceit of the non-innocent spouse" (emphasis added)). *But see Sweeney v. General Printing Co.,* 210 A.D.2d 865, 621 N.Y.S.2d 132, 133 (App.Div. 3d Dep't 1994)

(concluding that "[t]he drafters of CPLR 214–c intended the term 'injury' to refer to an actual illness, physical condition or other similarly discoverable *objective* manifestation of the damage caused by previous exposure to an injurious substance" (emphasis added)).

The law must take into account the reasonable intellectual and emotional states of people in plaintiffs' particular positions. *Cf.* Carol Gilligan, *In a Different Voice* (1982) (gender differences in perception and construction of social and legal relationships). A plaintiff who is illiterate, non-English speaking, legally and medically unsophisticated, living in an isolated location or lacking in intelligence cannot be treated as if she were a sophisticated, well-read, English-speaking medical professional living in Manhattan and married to a malpractice lawyer. *But see Mesa v. United Nations Dev't Corp.*, 157 Misc.2d 362, 596 N.Y.S.2d 1012 (Sup.Ct.N.Y.County 1993) ("excuses" offered for plaintiff's failure to file her claim on a timely basis—inability to speak or understand English and ignorance of legal requirements—held "inadequate"). In a society in which many women's self-worth remains tied to their ability to produce healthy children, every woman who has been told that she will forever be childless cannot be expected as a matter of law to begin immediately a wide-ranging, dispassionate study and analysis of the basis for her condition. *See* David Behrens, *More Choosing Option of Single Motherhood,* Orlando Sentinel Trib., Jan. 7, 1992, at E1 (on bearing children to boost self-worth); James M. Oleske, *AIDS in Our Children—Who Cares for Them?,* Issues L. & Med., Mar. 22, 1990, at 37 (noting "cultural-social pressures … [on] women to bear children as an expression of self worth"); Maryann Ondovcsik, *Sexual Psychiatry; Therapy for Women Should be Based on Studies of Women,* Health, July 1984, at 11 ("[B]eing married and having children are crucial to the self-worth of many women . . . .").

In a sometimes male-dominated legal and scientific world, we impose a requirement of absolute rationality, as viewed in hindsight, only at great risk to a just society. The legal principle remains the same and applies to all people, but in different situations it is reasonable for reasonable people to know and react differently to that principle.

One New York court rejected psychological repression as a basis for tolling the statute of limitations in a civil case brought by a plaintiff against her father for childhood sexual abuse. *Burpee v. Burpee,* 152 Misc.2d 466, 578 N.Y.S.2d 359, 360–61 (Sup.Ct.Nassau County 1991); *see also Schmidt v. Bishop,* 779 F.Supp. 321, 329–30 (S.D.N.Y.1991) (applying New York law to reach a similar result). Recognizing that a plaintiff's emotional state and personal resources play a factor in the reasonableness of a plaintiff's discovery of her "injury," and that the jury should be allowed to consider that factor, is different from establishing a rule that the limitations period is tolled if plaintiff has repressed memories in the clinical sense as in *Burpee.*

The reasonableness standard that must be adopted for section 214–c as applied to DES cases does not mandate a timeliness finding for plaintiffs. A jury might reasonably conclude that, for example, a non-English speaker should have more promptly sought assistance of a translator, or that a legal unsophisticate should have acted more aggressively in finding other, more knowledgeable, people to guide her in appreciating the legal and scientific implications of her condition before she was aware of them. But it does increase the fairness of the result by not punishing plaintiffs for their reasonable and justifiable lack of personal resources or capabilities.

## C. Two–Injury Rule

 Where the statute of limitations has run on one exposure-related medical problem, a later exposure-related medical problem that is "separate and distinct" is still actionable under New York's two-injury rule. *Fusaro v. Porter–Hayden Co.,* 145 Misc.2d 911, 548 N.Y.S.2d 856 (Sup.Ct.N.Y.County 1989), *aff'd,* 170 A.D.2d 239, 565 N.Y.S.2d 357 (App.Div. 1st Dep't 1991). Under the rule, diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the presence of one is not

necessarily a predicate for the other's development. *See id.*, 548 N.Y.S.2d at 859.

This "splitting" of what once might have been considered a single cause of action was a widespread development required by the growth of mass torts predicated upon latent injuries. *Cf. Campo v. Asbestospray Corp.*, 158 A.D.2d 259, 550 N.Y.S.2d 663 (App.Div. 1st Dep't 1990) (dismissing plaintiffs' complaint, as seeking "advisory opinion," where plaintiffs who suffered from minor medical problems filed to preserve their right to recover for more serious, but as yet unmanifested, prospective problems). Under the old rule, were the plaintiff to sue for the earlier manifestation, she might exhaust her cause of action and be denied a claim for the often more serious later one. Eileen B. Hershenov et al., *The Effect of Equity on Mass Tort Law*, 1991 U.Ill.L.Rev. 269, 313–16 (discussing problem and some solutions). *See generally* Kenneth R. Feinberg et al., *Mass Torts: Cases and Materials* 2–1 to 2–144 (1994). Waiting to see if the later disease would ensue would often bar a claim for the earlier discovered defect.

In *Fusaro*, the case often credited with establishing the two-injury rule in New York State, the court concluded that, in relation to asbestos exposure, asbestosis and mesothelioma are "separate and distinct [since] a party with asbestos has no way of knowing whether or not he will develop cancer." 548 N.Y.S.2d at 859. The *Fusaro* court explained that "[i]t is precisely because courts have rejected claims by asbestos victims for increased risk of cancer on the ground that they are too speculative that the right to recover independently should a second injury develop has been recognized." *Id.*, 548 N.Y.S.2d at 859–60 (citing *Pollock v. Johns–Manville Sales Corp.*, 686 F.Supp. 489 (D.N.J.1988); *Mauro v. Raymark Indus., Inc.*, 116 N.J. 126, 561 A.2d 257 (1989); *Devlin v. Johns–Manville Corp.*, 202 N.J.Super. 556, 495 A.2d 495 (Super.Ct.Law Div.1985)).

The progression of a single disease into a more serious or debilitating form does not necessarily give rise to an actionable second "injury." *See, e.g., Sweeney v. General Printing Co.*, 210 A.D.2d 865, 621 N.Y.S.2d 132, 133 (App.Div. 3d Dep't 1994) (evolution of "'low grade tumors'" into "more invasive tumors" necessitating bladder removal held not "separate and distinct disease process"); *Michael v. Ametelco, Inc.*, 150 Misc.2d 507, 568 N.Y.S.2d 1003, 1007–08 (Sup.Ct.Monroe County) (aggravation of dormant multiple sclerosis into active multiple sclerosis held not separate and distinct), *aff'd sub nom., Michael v. Eastern Alloys, Inc.*, 175 A.D.2d 667, 573 N.Y.S.2d 945 (App.Div. 4th Dep't), *appeal denied*, 78 N.Y.S.2d 862, 578 N.Y.S.2d 877, 586 N.E.2d 60 (1991). In *Wetherill v. Eli Lilly & Co.*, Index. No. 22566/92, slip op. at 6 (N.Y.Sup.Ct.N.Y.County Oct. 12, 1994) (unpublished), the court held that separate pregnancies requiring medical intervention due to plaintiff's DES-exposed incompetent cervix were not "separate and distinct."

### D. Jury Resolution of Factual Disputes

Statutes of limitations problems raised in complex cases such as the instant ones often present factual disputes appropriate for jury resolution. It is settled, for example, that the date that a plaintiff constructively discovered his or her "injury" is a mixed question of fact and law to be determined by the jury. *Glod v. Morrill Press Div. of Engraph, Inc.*, 168 A.D.2d 954, 564 N.Y.S.2d 905 (App.Div. 4 Dep't 1990); *see also Roman v. Radio Frequency Co.*, 207 A.D.2d 1012, 616 N.Y.S.2d 824, 824 (App.Div. 4th Dep't 1994) (citing *Glod*); *Bidetti v. Salter*, 108 A.D.2d 890, 485 N.Y.S.2d 772, 773 (App.Div. 2d Dep't 1985) (discovery rule applied in medical malpractice context, N.Y.Civ. Prac.L. & R. 214(6)). This result follows from the fact that "determination of a 'discovery date' ... can be ascertained primarily, if not exclusively, from plaintiff's knowledge." *Ooft v. City of New York*, 80 A.D.2d 888, 437 N.Y.S.2d 30, 31 (App.Div. 2d Dep't 1981).

The fact finder's role may also be implicated in the determination of what constitutes a "signature" disease, and whether a recently manifested medical problem is "separate and distinct" from an earlier one. Both statistical and medical testimony may be required to determine if a particular medical problem

constitutes a "signature" disease, and medical testimony may be required to determine whether a later medical problem reflects predictable, progressive deterioration from an earlier condition. *See Asbestos as Precursor of Lung Cancer a Question of Fact, New Jersey Court Says,* Mealey's Litig. Rep.: Asbestos, July 21, 1995, at 14 (reporting *Gauntlett v. Johns–Manville Sales Corp.,* No. A–2524–93T2 (N.J.Super.Ct.App.Div. July 14, 1995) and *Andusko v. Schuller Int'l Inc.,* No. A–2954–93T3 (N.J.Super.Ct.App.Div. July 14, 1995)).

 The New York rule requiring a jury determination for many section 214–c issues has particular force in a federal suit. In a federal court, the Constitution protects the right to a jury trial, U.S. Const. amend. VII ("In Suits at common law ... the right of trial by jury shall be preserved...."), and "federal policy favor[s] jury decisions of disputed fact[s]." *Byrd v. Blue Ridge Rural Elec. Coop.,* 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958); *see also Simler v. Conner,* 372 U.S. 221, 222, 83 S.Ct. 609, 610–11, 9 L.Ed.2d 691 (1963) ("The federal policy favoring jury trials is of historic and continuing strength."); 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2302.1, at 24 (1995) ("[T]here is a strong federal policy favoring trial by jury of issues of fact."); *cf. Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 565, 110 S.Ct. 1339, 1344–45, 108 L.Ed.2d 519 (1990) ("' "Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any curtailment of the right to a jury trial should be scrutinized with utmost care." ' " (quoting *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935))). In *Byrd,* a diversity case, the Court cited this policy when holding that a jury, rather than the judge as provided under state law, should determine if one of the defendants was statutorily immune under state law. The court explained:

> The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is

the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decision of disputed questions of fact to the jury.... The policy of uniform enforcement of state created rights and obligations ... cannot in every case exact compliance with a state rule—not bound up with rights and obligations—which disrupts the federal system of allocating functions between judge and jury. Thus the inquiry here is whether the federal policy favoring jury decisions of disputed fact questions should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in state court.

356 U.S. at 537–58, 78 S.Ct. at 901 (citations omitted).

### E. Suits by Nonresidents

#### 1. Borrowing statute

##### a. Applicability to section 214–c

 New York's "borrowing statute" provides that in actions brought by nonresidents, the shorter of the New York statute of limitations and that of the state "where the cause of action accrued" applies. N.Y.Civ. Prac.L. & R. § 202. It states:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

In *Besser v. E.R. Squibb & Sons, Inc.,* 146 A.D.2d 107, 539 N.Y.S.2d 734 (App.Div. 1st Dep't 1989), *aff'd,* 75 N.Y.2d 847, 552 N.Y.S.2d 923, 552 N.E.2d 171 (1990), the Appellate Division, First Department, held that the borrowing statute applies to the toxic tort "revival statute." The revival provision was part of the 1986 tort reform package that also included enactment of section 214–c. It created, inter alia, a one-year window for filing claims that were otherwise

time-barred. Revision was limited to claims based on the latent effects of exposure to five enumerated substances, including DES. The New York Court of Appeals affirmed the applicability of the borrowing statute to the revival provision "for reasons stated in the [Appellate Division's] opinion." *Besser*, 552 N.Y.S.2d at 923.

 The court's reasoning in *Besser*, based on legislative intent and the desire to prevent forum shopping, applies to the provisions of section 214–c implicated in the instant cases. The New York legislature did not "intend[ ] to create a national safe harbor for second chance litigation by otherwise time-barred claimants." *Besser*, 539 N.Y.S.2d at 739. The purpose of the revival statute was "to relieve the harsh results of New York's exposure-based statute of limitations," while the primary goal of the borrowing statute is to prevent forum shopping. *Id.*, 539 N.Y.S.2d at 738; *see also Antone v. General Motors Corp.*, 64 N.Y.2d 20, 484 N.Y.S.2d 514, 517, 473 N.E.2d 742 (1984) (purpose of borrowing statute). Construction of section 214–c so that claims brought under it are subject to the borrowing statute "afford[s] due regard" to "the policies of [both] statute[s]." *See Besser*, 539 N.Y.S.2d at 738.

### b. Date and place of accrual

"The controlling date for determining plaintiffs' residence [for borrowing statute purposes] is the date on which the cause of action accrued[,] not the date when the action is commenced." 1 Harold L. Korn & Arthur R. Miller et al., *New York Practice*, ¶ 202.03, at 2–58 (1994); *see also De Martino v. Rivera*, 148 A.D.2d 568, 539 N.Y.S.2d 38, 39 (App.Div. 2d Dep't 1989). "[A] plaintiff can avoid the operation of CPLR 202 only if she was a New York resident at the time her cause of action accrued." *Besser*, 539 N.Y.S.2d at 739; *see also Cellura v. Cellura*, 24 A.D.2d 59, 263 N.Y.S.2d 843 (App.Div. 4th Dep't 1965); *Fraser v. Eli Lilly & Co.* (N.Y.App.Div. 1st Dep't), *reprinted in* N.Y.L.J., Apr. 18, 1994, at 29 (applying *Besser*).

A lingering question is whether the time and place of claim accrual, for borrowing statute purposes, is determined by the "grouping of contacts" approach applied to substantive choice-of-law problems in New York, or by a "place of injury" construction. *See Sack v. Low*, 478 F.2d 360, 365–67 (2d Cir.1973); *In re Joint E. & S. Dist. Asbestos Litig.*, 721 F.Supp. 433, 434 (E. & S.D.N.Y. 1988) (Sifton, J.); 1 Korn & Miller et al., *supra*, ¶ 202.4. The New York Court of Appeals has not decisively ruled on the issue. To the contrary, it has intermixed the language of both approaches within a single opinion. *Compare Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 403 N.Y.S.2d 185, 189, 374 N.E.2d 97, 101 (1978) ("[F]or purposes of the borrowing statute, CPLR 202, plaintiff's causes of action accrued in Virginia, the *place of injury*." (emphasis added)) *with id.* ("In barring plaintiff's causes of action, we observe that *no expectation interest* of the nonresident is frustrated by application of [Virginia's statute of limitations]." (emphasis added)).

 The Second Circuit court of appeals has predicted that New York's highest court would adopt a "place of injury" rule for borrowing statute purposes. *See Stafford v. International Harvester Co.*, 668 F.2d 142, 149–50 (2d Cir.1981); *Sack*, 478 F.2d at 365. *But see Barsam v. Pure Tech Int'l, Inc.*, 864 F.Supp. 1440, 1454 (S.D.N.Y.1994) ("Although the interest test would be especially appropriate in this case, I feel compelled ... to follow the Second Circuit's adherence to the traditional place-of-injury test."). While remaining *dubitante*, the Eastern District follows the Southern District in reluctantly paying attendance upon the Second Circuit court of appeals on this point. The "place of injury" test will be applied in the instant cases.

*Stafford* also predicted that the New York Court of Appeals "would decide that a cause of action cannot accrue for purposes of New York's borrowing statute in a state which could not exercise jurisdiction over the cause of action." 668 F.2d at 150–54. Whether the other states arguably implicated in the instant cases could have exercised jurisdiction over defendants is unclear. They may not have as liberal a view of DES-based jurisdiction as does New York. *See Carrano v.*

*Abbott Lab. (In re New York County DES Litig.),* 202 A.D.2d 6, 615 N.Y.S.2d 882 (1st Dep't 1994); *In re DES Cases (Ashley v. Abbott Lab.),* 789 F.Supp. 552 (E.D.N.Y. 1992). Defendants have not challenged plaintiffs' claims on this ground.

■ Applying the "place-of-injury" test does not answer the question of whether the cause of action in DES cases accrues, for borrowing statute purposes, at the place of exposure or at the place where the medical problem becomes manifest. The case law is muddy and conflicting. A fully satisfying synthesis of the existing precedents is impossible. On balance, for reasons to be explained, it is predicted that the New York Court of Appeals—if it follows *Stafford*—would find that a cause of action for DES accrues, for borrowing statute purposes, in the state (or possibly states) where the medical problems became manifest.

A review of the case law indicates a number of approaches that have been applied to determine when a cause of action accrues for borrowing statute purposes. Some overlap in fact although their language differs.

### i. Place of encounter with harmful instrumentality

A number of cases have implicitly found that the cause of action accrues, for borrowing statute purposes, at the point of plaintiff's encounter with the instrumentality that did her harm. Under this formulation, the time and place of defendant's wrongful conduct, and the time(s) and place(s) where plaintiff's injuries were actually manifested and experienced, are irrelevant.

This is the approach that the lower courts, by and large, have adopted in DES and asbestos cases. *See, e.g., Besser,* 539 N.Y.S.2d at 736 n. 3 (citing New York Court of Appeals cases not decided under the borrowing statute, and which predate the 1986 statutory amendments, for the proposition that " 'injury,' if any, occurs at the time, and thus the place of exposure"); *Fraser,* N.Y.L.J., *supra,* at 29 (applying *Besser,* and holding that, for borrowing statute and other purposes, "[u]nquestionably, plaintiff's claim accrued in Washington, where her exposure to DES occurred" rather than in New York,

the state of her current residence and where her injuries were manifested); *Culpepper v. Eli Lilly & Co.,* Index No. 115878/93, slip op. at 1–2 (N.Y.Sup.Ct.N.Y.County Mar. 14, 1995) (unpublished) ("The parties agree that plaintiff's cause of action accrued in North Carolina, where the exposure to DES occurred." (citing *Besser* )); *Scalone v. Celotex Corp.,* 718 F.Supp. 215 (S.D.N.Y.1989) (place of "exposure" to asbestos, rather than place plaintiff fell ill, held to be place of injury for borrowing statute purposes), *aff'd without op.,* 923 F.2d 843 (2d Cir.1990); *cf. Keene Corp. v. United States,* 700 F.2d 836, 843–44 (2d Cir.1983) (admiralty jurisdiction does not extend to workers exposed to asbestos in land-based commercial facilities since situs of tort was not "navigable waters"), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

The New York Court of Appeals has never, in its own construction of the borrowing statute in personal injury cases, held that a claim accrued at a point before the harmful instrumentality acted upon the plaintiff.

### ii. Place where injury is perceived

Other cases have found that the cause of action accrues, for borrowing statute purposes, at the point at which the plaintiff perceives his or her injury.

■ This is the approach applied in suits alleging economic harms, such as fraud actionable under section 10(b) of the Securities Exchange Act. There, the cause of action accrues, for borrowing statute purposes, where the economic impact of defendant's conduct is "felt" or "suffered." *See Block v. First Blood Assocs.,* 988 F.2d 344, 349 (2d Cir.1993); *Sack,* 478 F.2d at 366 ("[T]he cause of action accrues for the purposes of the borrowing statute in the state where the injury is suffered rather than where the defendant committed the wrongful acts."); *Arneil v. Ramsey,* 550 F.2d 774, 779 (2d Cir. 1977); *Barsam,* 864 F.Supp. at 1455; *Avagliano v. Sumitomo Shoji America, Inc.,* 614 F.Supp. 1397, 1405 (S.D.N.Y.), *recons. denied,* 107 F.R.D. 748 (S.D.N.Y.1985).

This is also, arguably, the approach that is typically adopted in traditional product liability actions—i.e., those that do not involve

substances with latent manifestations. *See, e.g., Myers v. Dunlop Tire & Rubber Corp.,* 40 A.D.2d 599, 599, 335 N.Y.S.2d 961, 962 (App.Div. 1st Dep't 1972) (injury accrued for borrowing statute purposes in Kentucky (where a tire manufactured by defendant exploded) rather than in New York (where the tire was manufactured)); *Nielson v. Avco Corp.,* 54 F.R.D. 76, 80 (S.D.N.Y.1971) (injury accrued for borrowing statute purposes in Alberta (where the plane crashed), rather than in Pennsylvania (where defendant's plane engine was manufactured and installed) or British Columbia (plaintiff's and decedent's residence and the plane's final destination)).

It is possible to conceive of traditional products liability cases in terms of latency. Consider the passage of time from when the product was negligently designed or manufactured, or when inadequate warnings were attached, to when the product worked its physical harm on the plaintiff. In between is the moment when plaintiff first, and unknowingly, encountered the instrumentality which was later to cause his or her harm. That moment—say, when plaintiff first used a forklift that only later malfunctioned, or drove on a defective tire that later exploded—is not discussed or mentioned in the cases.

At least one case decided under New York law appears to have adopted a variation on the "place where injury is felt" approach in a case involving a toxic harm with a latency. *See In re Joint E. & S. Dist. Asbestos Litig.,* 721 F.Supp. at 434 (applying New York's borrowing statute to a claim based on asbestos exposure, and concluding that "[i]t seems clear that, where slowly developing personal injury claims ... are concerned, this 'last event' is the fact of plaintiff's becoming ill."); *cf. Renfroe v. Eli Lilly & Co.,* 686 F.2d 642, 647 (8th Cir.1982) (noting, in applying another state's borrowing statute in a DES case: "When the cancer developed and became capable of ascertainment, the final element of the cause of action occurred, and their respective cause of action accrued under Missouri law."); *Trahan v. E.R. Squibb & Sons, Inc.,* 567 F.Supp. 505, 507 (M.D.Tenn.1983) (noting, in applying choice-of-law principles to determine what substantive law to apply in a DES case: "The 'last event' necessary to create liability is the development of the condition, not the exposure to a drug with latent detrimental effects.").

### iii. Place where viable cause of action becomes possible

A formulation that appears to have some currency in the New York Court of Appeals construes "place of accrual" as the place where plaintiff first possessed a cause of action. *See Martin v. Julius Dierck Equip. Co., supra;* 1 Korn & Miller et al., *supra,* ¶ 202.4, at 2–61 ("place of injury," for borrowing statute purposes, means "the time when, and the place where, the plaintiff first had the right to bring the cause of action"); *cf. Snyder v. Town Insulation, Inc.,* 81 N.Y.2d 429, 432, 599 N.Y.S.2d 515, 516, 615 N.E.2d 999, 1000 (1993) (noting, in non-borrowing statute context, that "accrual occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in complaint").

In *Martin,* the New York Court of Appeals held that, for borrowing statute purposes, plaintiff's cause of action accrued in Virginia, where plaintiff was injured by an allegedly malfunctioning forklift, rather than in New York, where the forklift was manufactured and delivered. The court explained: "Plaintiff possessed no cause of action, in tort or in contract, anywhere in the world until he was injured [by the forklift] in Virginia." *Martin,* 403 N.Y.S.2d at 189, 374 N.E.2d at 101. The implication is that plaintiff's action accrued at the point that he had a *viable* claim.

A formulation that turns on when plaintiff's action "came into existence," *see id.,* raises questions of its own. The primary question is whether omniscience is required regarding what physiological changes have occurred, and whether they will one day be harmful. Does a cause of action come into existence where plaintiff does not, and cannot, know that physiological changes are at work in her body because such changes are imperceptible to the plaintiff or to anyone else? If the agent has worked changes on plaintiff's body, but the changes are inconsequential, can plaintiff be said to have been "injured," independently of whether or not

she is aware of the changes? If not, then at what point in the progress from inconsequential to consequential changes does the "injury" occur? Under the strictest construction, a cause of action could be said to accrue years before plaintiff—or anyone—could determine that 1) physiological changes, perhaps on the cellular level, had taken place; and 2) such changes were injurious.

Another problem raised under the "came into existence" formulation is how to handle the situation where multiple, "separate and distinct" injuries ultimately ensue from one harmful agent. Does the claim accrue for borrowing statute purposes at the onset of the first perceived problem or change? Or are there multiple moments of accrual—one for each "separate and distinct" injury?

*Martin* did not deal with a "progressive" injury, so the analysis was straightforward. No other Court of Appeals decision provides additional insight.

The Court of Appeals has, however, explicated the notion of "accrual" in cases construing statutes of limitations, as distinct from the borrowing statute, as they existed prior to the 1986 tort reform package. *See Snyder v. Town Insulation, Inc., supra,* 599 N.Y.S.2d at 517–18, 615 N.E.2d at 1001–02 (construing concept of "accrual" under pre–1986 case law, and summarizing holdings of earlier cases). In *Snyder,* the Court of Appeals explained its prior holdings, and cited a variety of concededly narrow "traditional" and "established" rules":

> In *Schmidt,* a worker commenced a negligence action against his employer, alleging that inhalation of dust on the job resulted in lung disease several years later. He argued that accrual should be marked from the date of the onset of the disease (270 N.Y. 287, 300, 200 N.E. 824 (1936) ...). We rejected that proposition and restated the traditional rule: "There can be no doubt that a cause of action accrues only when the forces wrongfully put in motion produce injury" (*id.,* at 300, 200 N.E. 824). Disease was a consequence of the injury, we said, not the injury itself, and the injury was complete at the moment the dust was inhaled even though

plaintiff may not have been aware of it then. . . .

> The question in *Schwartz* [*v. Heyden Newport Chemical Corp.,* 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142] (1963) was whether a discovery rule should apply to a claim that the harm caused by a substance taken at a hospital in 1944 first became apparent 13 years later when cancer was discovered. We once again stated the established rule: "[T]he action accrues only when there is some actual deterioration of a plaintiff's bodily structure" (at 217, 237 N.Y.S.2d 714, 188 N.E.2d 142). This, we concluded, occurred at the time the substance was introduced into plaintiff's body.

*Id.* at 517, 615 N.E.2d at 1001. The quoted language would suggest that, prior to 1986, claims "accrued" for statute of limitations purposes at the moment of any physical deterioration, no matter how imperceptible.

It is not apparent that the narrow approach "tradition[ally]" applied in the statute of limitations context would apply to modern borrowing statute construction. First, while the statute of limitations analysis is only concerned with whether a claim is time-barred, the borrowing statute analysis is concerned with a concededly procedural choice-of-law problem—choosing from among the laws of other jurisdictions. It is appropriate that in the borrowing context, a concept of accrual be adopted that is sensitive to the jurisdictional aspects of the injury, as described in more detail below. Second, it is not at all clear that the pre–1986 analysis of claim accrual for statute of limitations purposes survived enactment of the tort reform package.

#### iv. Place of "last event"

Some courts have attempted to apply what purports to be a unitary principle applicable to all factual contexts in which the borrowing statute is applied: the place of accrual for borrowing purposes is the place where " 'the last act necessary to establish liability' " occurred. *Nielson,* 54 F.R.D. at 80 (construing the legislative history of the borrowing statute, and citing *George v. Douglas Aircraft Co.,* 332 F.2d 73 (2d Cir.1964)); *see also In re Joint E. & S. Dist. Asbestos Litig.,* 721 F.Supp. at 434 ("[T]he 'place of injury' is the

'state where the last event necessary to make an actor liable for an alleged tort takes place.'" (quoting *Conklin v. Canadian–Colonial Airways, Inc.*, 266 N.Y. 244, 248, 194 N.E. 692 (1935); *Restatement (First) of Conflict of Laws* § 377) (1934))).

The "last event" test apparently derives from the *Restatement (First) of Conflict of Laws* § 377 (1934), where it was a key aspect of the "vested rights" approach used to determine what substantive law to apply in tort actions implicating multiple jurisdictions. Under the vested rights approach, the local law of the "place of wrong" determined the substantive law. *See Restatement (Second) of Conflict of Laws* 412–14 ("Introductory Note") (quoting the original Restatement). With the Second Restatement, the vested rights approach, together with the "last event" test, was replaced by an "interest" analysis. *See id.; see also id.* § 145. The First Restatement has apparently been deemed by some courts to have continuing applicability in the New York "borrowing statute" context, absent a definitive New York Court of Appeals ruling adopting the more progressive and modern "interest" approach to these cases. This reactionary mode is anomalous since it was the New York Court of Appeals cases that strongly influenced the Second Restatement and modern conflicts developments. *Cf. Babcock v. Jackson*, 12 N.Y.2d 473, 477–78, 240 N.Y.S.2d 743, 746, 191 N.E.2d 279, 281 (1963) (applying "interest" analysis to *substantive* choice-of-law problems), described in more detail, *infra.*

In one case involving a latent injury, a federal district court applying New York law held that the "last event" was "the fact of plaintiff's becoming ill" rather than the date that he was exposed. *In re Joint E. & S. Dist. Asbestos Litig.*, 721 F.Supp. at 434. At least two courts applying the law of other jurisdictions in DES cases reached a similar conclusion. *See Renfroe, supra* (borrowing statute context) and *Trahan, supra* (substantive choice-of-law context).

The "last event" test does not explain satisfactorily the existing New York case law. As the review of cases demonstrates, possible "last events" include: plaintiff's first encounter with the instrumentality of his or her later injury; plaintiff's actual "experience" of the injury; and plaintiff's awareness of a problem on which he or she can assert a cause of action.

v. Place where injury was manifested

With respect to injuries caused by DES, it is predicted that the Court of Appeals would hold that the cause of action accrues, for borrowing statute purposes, at the point where the injury is manifested. Much of the case law, notwithstanding the inconsistencies, and compelling policy reasons support this conclusion.

As noted above, with respect to economic injuries and product liability claims that are not said to involve latencies, plaintiffs' claims do not accrue for borrowing statute purposes until the injuries are perceived. In particular, with respect to product liability suits, it is the actual hurt rather than the encounter with the harmful instrumentality that is significant. These are sensible constructions that tie plaintiffs' rights to the point that suit, as a practical matter, becomes possible. *See Martin, supra.*

Products liability cases that do not involve latencies might alternatively be characterized as accruing at the "time and place where the instrumentality first works its harm on the plaintiff," as where a tire explodes or a plane crashes, instead of "where the injury is felt." The cases do not distinguish between the "place injury is felt" and the "place were the instrumentality first worked its harm," since in the traditional products liability context, those moments occur simultaneously, and an intuitive understanding of "injury" appears to be assumed. With respect to substances with latent effects, however, these two moments are different. That is one of the reasons why it is difficult to apply old case law to DES situations.

The lower courts' analysis of DES and asbestos cases stand out as anomalies, even given the conflicting and confusing language of the cases. Their approach would base accrual, for borrowing statute purposes, at a point before plaintiffs, as a practical matter, have a claim—i.e., before their "changes" are sufficient to constitute an "injury," and be-

fore their "injury" is perceptible to them, or to anyone else.

At the time DES daughters are exposed— *in utero* —they do not possess an actionable claim, but merely have encountered the instrumentality of their future harm. Paraphrasing *Martin,* "plaintiff[s] possessed no cause of action, in tort or in contract, anywhere in the world until" their DES injuries became physical and palpable. This is a corollary to the observation that a plaintiff who was exposed to DES but never manifested any symptoms would, in most instances, never possess a cause of action, notwithstanding any inconsequential changes that took place on the cellular level.

In addition to the practical reasons and the confused force of precedent outlined above, compelling policy reasons support adoption of a "place of manifestation" rule in DES cases for New York borrowing statute purposes. It holds the plaintiff to the law of jurisdictions in which she chose to be. In contrast to product liability suits that do not involve latencies, and even in contrast to most of those that do (such as asbestos), in DES the mothers rather than the plaintiffs chose to be in the jurisdiction where the drug was imbibed. Plaintiffs were not even viable at the place and time that defendants suggest should control their ability to recover, much less conscious and willing residents of the relevant jurisdiction. By the time the disease becomes manifest, the DES daughter may live in a jurisdiction far from where the mother ingested the drug. *Cf. Hymowitz, supra.*

The main benefit of adopting a place of exposure rule for borrowing statute purposes would be its ease of applications in cases where the mother did not travel while taking the drug. The factual disputes over where the fetus was exposed are fewer and less complicated, and more easily resolved on the basis of objective evidence, where the mother remained in one state during pregnancy, than disputes over where the injury became manifest, where the daughter travelled widely. As a group, DES daughters are probably more transient in their adulthood than were their mothers during the nine months of pregnancy.

A manifestation-based rule has its drawbacks. The word "manifestation" is susceptible of many meanings and might often require judicial construction and refinement in individual cases. Scientific testimony might be required to determine whether a particular symptom is connected to the underlying DES exposure, and therefore a bona fide "manifestation." The plaintiff's state-of-mind, always a difficult matter to establish, might be put in issue if "manifestation" is construed to require the plaintiff's awareness of her symptoms. Some plaintiffs might seek to manipulate "manifestation" to secure the most plaintiff-friendly forum. In contrast, exposure can often be established by largely objective criteria, including medical and hospital records, pharmaceutical records and residence records for the presumably nine months preceding birth.

Nevertheless, while a manifestation-based rule may sometimes raise more factual issues and be more difficult to apply than an exposure-based rule, it is workable as well as fair. Courts routinely construe "manifestation of injury" in other contexts. *See, e.g., Insurance Co. of North America v. U.S. Dep't Labor,* 969 F.2d 1400 (2d Cir.1992) (situs requirement under Longshore and Harbor Workers' Compensation Act in effect on date of injury's manifestation, rather than that in effect at time of last asbestos exposure, governs claim), *cert. denied,* —— U.S. ——, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993); Chandra Lantz, Note, *Triggering Coverage of Progressive Property Loss: Preserving the Distinctions Between First- and Third–Party Insurance Policies,* 35 Wm. & Mary L.Rev. 1801, 1804 (1994) (summary of five approaches, including "manifestation rule," applied in context of continuing losses to determine whether property damage is covered by insurance policies); *cf. Block, supra; Sack, supra; Arneil, supra; Barsam, supra; Avagliano, supra* (claims based on economic injury accrue for borrowing statute purposes where they are "felt").

The fact that some courts have construed the "place of injury" to be the "place of exposure" for choice-of-law purposes, to determine what substantive law should apply to claims based on the latent effects of toxins, is

not decisive in borrowing statute analysis. *See, e.g., Benson v. Syntex Lab.,* 161 Misc.2d 822, 614 N.Y.S.2d 990, 994 (Sup.Ct. Chautauqua County 1994) (construing New York's long arm statute, and holding "[w]here an allegedly harmful substance is ingested in New York resulting injuries are deemed to occur at the place of exposure[,] not the place where the injury-causing substances was manufactured"); *Suntava v. Eli Lilly & Co.,* Index No. 26460–92, slip op. at 2 (N.Y.Sup.Ct.N.Y.County Apr. 18, 1995) (unpublished) ("This court has previously ruled that actions brought by residents of foreign states exposed to DES in those states shall be governed by the substantive law of the state of exposure."); *Lowe v. Eli Lilly & Co.,* Index No. 40000/90, slip op. at 2 (N.Y.Sup.Ct.N.Y.County Mar. 15, 1995) (unpublished) (similar); *Godfrey v. Eli Lilly & Co.,* Index No. 107889/93 (N.Y.Sup.Ct.N.Y.County Feb. 14, 1995) (decision from bench) (similar); *see also In re DES Cases (Ashley v. Abbott Lab.),* 789 F.Supp. 552 (E.D.N.Y.1992) ("[T]ort 'occurred' ... where the drug was taken and worked its effect"); *cf. In re "Agent Orange" Prod. Liability Litig.,* 580 F.Supp. 690, 707–08 (E.D.N.Y.1984) (suggesting that traditional lex loci analysis would normally look to overseas locations (i.e., place of exposure for veterans claiming injury from contact with Agent Orange) as " 'the place of the wrong' ").

■ Different constructions of claims "accrual" may apply within the choice-of-law context, for various purposes and issues, and within the "borrowing" context. *George v. Douglas Aircraft Co.,* 332 F.2d 73, 78 (2d Cir.) ("[W]e perceive no obstacle to predicting that the New York Court of Appeals would consider a cause of action as 'arising' for the purposes of the borrowing statute in a state different from the one whose substantive law would determine liability."), *cert. denied,* 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964) (1964); *Stafford,* 668 F.2d at 150 n. 6 (similar); *Restatement (Second) of Conflicts, supra,* § 145 cmt. d ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states."); *cf. In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken),* 129 B.R. 710, 834–35 (E. & S.D.N.Y.1991) (noting that while some jurisdictions may trigger the statute of limitations on manifestation of injury, for Article III "case or controversy purposes" the date of exposure is the operative time period), *vacated on other grounds,* 982 F.2d 721 (2d Cir. 1992), *modified on reh'g,* 993 F.2d 7 (2d Cir.1993). The fact that a state has adopted a "place of exposure" for choice-of-law substantive purposes does not mean that it would adopt the same criterion for claim accrual under its borrowing statute.

Given the essential fairness of a manifestation-based rule in a DES case, acknowledgment by the New York Court of Appeals of the special problems in DES cases, and Court of Appeals' precedent in traditional personal injury and products liability cases, New York's highest court would likely adopt a manifestation-based rule over an exposure-based rule in DES cases for borrowing statute purposes. The place, or possibly places in the case of a peripatetic plaintiff, in which a plaintiff's injuries became manifest determines which foreign statute of limitations to apply under New York's borrowing statute.

Further construction of the term "manifestation" will have to await another day. Under a manifestation-based approach, possible accrual incidents may include: first symptoms, diagnosis, plaintiff's subjective awareness of an illness and its human cause (as in the statute of limitations context) or something else altogether. *Cf. In re Joint E. & S. Dist. Asbestos Litig.,* 721 F.Supp. at 435 ("last event," and thus accrual date for borrowing statute purposes, in asbestos case, held to be plaintiff's "becoming ill. . . . not necessarily plaintiff's discovery of his illness"). New factual disputes may arise, possibly necessitating further construction, once the parties brief and apply the law of the manifestation states.

Solely for the practical purpose of deciding this motion based on the information before the court, the "place of "manifestation" is assumed to be the "place of diagnosis" as documented in papers submitted by the parties to date.

The availability of a manifestation-based rule in cases involving other toxins with latencies, such as asbestos, is not determined by a DES decision. As *Hymowitz* recognized, DES is unique, presenting new challenges to traditional ways of looking at legal issues, and particularly at procedures insensitive to modern types of harms. DES daughters are novel among plaintiffs injured by toxins with latencies for the reasons already noted.

### vi. Possible applicability of "interest" analysis once New York is ruled out as accrual jurisdiction

While a form of manifestation-based rule is applied in the instant cases, it is not at all clear that the New York Court of Appeals would necessarily adopt a single rule to be applied uniformly to all borrowing statute issues in every case, even assuming that it rejected "interest" analysis in favor of "place of injury" analysis as has been predicted by the Second Circuit court of appeals.

■ Conflicts analysis might be more subtle in weighing the equities of plaintiffs, defendants and interested jurisdictions. Conflicts law is essentially equitable. *Cf.* Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law*, 92 Colum.L.Rev. 249, 309 & n. 353 (1992). Its fundamental equitable nature has, in recent years, broken through the formalistic and legalistic rigidities of the past. *See Babcock v. Jackson, supra* (rejecting lex loci approach and adopting interest analysis to substantive choice-of-law problems); Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum.L.Rev. 772 (1983).

In stark contrast to the modern progressivism of choice-of-law analysis of substantive issues, borrowing statutes remain constrained, by and large, in unyielding adherence to form over substance. One theorist explains:

> Modern choice of law repudiates [the formalism of a vested rights approach] in favor of broader based analyses that take into account different factors like the expectations of the parties, the respective states' policy interests and the equity and

fairness of the result of the case to either party. Borrowing statutes, on the other hand, still rely on the outmoded analytical premises of vested rights, and thus unsurprisingly tend to support arbitrary and unjust results.

Ibrahim J. Wani, *Borrowing Statutes, Statutes of Limitations and Modern Choice of Law*, 57 U.M.–K.C.L.Rev. 681 (1989) (citations omitted).

■ Neither the text of the New York borrowing statute, nor the legislature's design in enacting it, requires such rigidity. The borrowing statute is the mechanism by which New York balances its commitment to providing justice in individual cases with the practical need to prevent the jurisdiction from being inundated by those plaintiffs whose interests in justice can more appropriately be served in other states. *See Antone*, 484 N.Y.S.2d at 517, 473 N.E.2d at 745 (purpose of statute).

■ Once New York state has been ruled out as the "accrual" jurisdiction for borrowing statute purposes, there is no overriding reason for applying a fixed bright-line rule in choosing from among the remaining possible jurisdictions—a rule that is insensitive to the parties' individual situations and to the views of the jurisdictions with an interest in their cases. When it is apparent that a plaintiff's claim did not "accrue" in New York for borrowing statute purposes, the borrowing statute's purpose has been accomplished. Continuing to use a hard-edged test of "accrual," when the choice comes down to which of two or more *foreign* jurisdictions' laws to apply, may wreak unnecessary hardship on plaintiffs. There is a residual interest of New York in rendering justice to parties before it even if it applies the law of another state for borrowing, jurisdictional or substantive purposes.

■ At the point that New York has been ruled out as the "accrual" jurisdiction, the most sensible approach would be to examine the policies of the various foreign states potentially implicated in the case and the interests of the parties. In *Babcock v. Jackson, supra*, the Court of Appeals recognized, in Judge Fuld's landmark opinion, that

individual states' interests, and individual claimants' needs for justice, should not be denigrated through use of relatively easy-to-apply, but simple-minded, approaches to conflicts problems. Without importing *Babcock* wholesale into the borrowing context, it is possible to adhere to its fundamental insight: that sensitivity to other states' potential interests in a claimant's recovery, or a defendant's protection, requires a certain amount of flexibility and ad hoc consideration of the parties' and states' particular situations.

The borrowing statute, once it has served its anti-forum shopping purpose, does not require blindness to these variations, and to the possible unfairness to plaintiffs that could result from an automatic rule. New York policy towards plaintiffs, and the state's commitment to providing justice in individual cases rejects such a harsh and unthinking result.

In at least one diversity case, the Second Circuit court of appeals has varied from a rigid rule of accrual in a borrowing statute context when choosing between possible foreign jurisdictions. In *George v. Douglas Aircraft Co., supra,* plaintiffs' claims arose when a plane manufactured in California crashed in Florida en route to South America. Citing "New York's policy ... to protect a nonresident defendant against an action in New York, which was timely because of [New York's tolling provisions], but had become barred elsewhere," *George,* 332 F.2d at 78, the Second Circuit court of appeals held that California, rather than Florida, was the state of accrual for borrowing statute purposes, "despite general statements that a tort action inevitably 'arises' where the last act necessary to establish liability occurred." *Id.* at 79.

While the federal court of appeals cited New York's pro-out-of-state defendants' policy for its deviation in *George,* an airplane crash case from the Southern District of New York decided seven years later relied on that court's perception of the opposite trend in its construction of the borrowing statute: "the trend in the New York Court of Appeals[, in choice-of-law problems not involving the borrowing statute] ... [is] in favor of extending recovery to plaintiffs in multistate situations,

whether or not they or their decedents are or were New York residents." *Nielson,* 54 F.R.D. at 80 (cause of action accrued in Alberta, for borrowing statute purposes, where plane carrying British Columbia resident crashed in Alberta en route to British Columbia, and where claim would be time-barred under British Columbia law but not under Alberta law).

vii. Place most favorable to defendant

Notwithstanding the New York Court of Appeals' identification of limiting forum shopping as the "primary purpose" of the borrowing statute, *Antone,* 484 N.Y.S.2d at 517, 473 N.E.2d at 745, some courts have found an additional purpose—to "afford resident defendants the benefit of the shortest limitations period." *See Besser,* 539 N.Y.S.2d at 737; *Sack,* 478 F.2d at 367 (citing New York Court of Appeals' decision construing predecessor statute that differed in substantial respects from the one that replaced it).

It bears noticing that protection of resident defendants' interests has not been emphasized by the New York Court of Appeals as a "purpose" of the borrowing statute. But even if it were to be accepted as a purpose to be achieved by statutory construction, it would not be determinative in the DES cases, when defendants are treated as "national" and fungible rather than as tied indelibly to a particular jurisdiction. *See Ashley, supra,* and *Hymowitz, supra.* Nor does protection of the rights of a foreign resident plaintiff fall outside the realm of appropriate concerns for New York courts. Defendants' protection is not the overriding test.

c. Jury resolution of factual disputes

■ Once the applicable law is decided, factual issues relating to the application of the borrowing statute present jury questions. *See Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 242, 244 (2d Cir.1984). These issues are best determined at trial.

2. Other states' statutes of limitations

With the exception of claims brought by Harnett and Larson, defendants ground their statutes of limitations-based motions for summary judgment solely on the New York

statute. Because of this strategic decision by defendants, discussion of other states' statutes of limitations law is only required with respect to a few plaintiffs.

### a. Harnett

Harnett's case is straightforward. Manifestation occurred in Colorado, which was also the place of exposure. Products liability claims brought in Colorado must be commenced "within two (2) years after the claim for relief arises and not thereafter." Colo.Rev.Stat. § 13–80–106(1) (1994). Colorado has enacted a "discovery" rule, under which the statute of limitations does not run until "the date both the injury and its cause are known or should have been known by the exercise of diligence." Colo.Rev.Stat. § 13–80–108(1) (1994). Colorado courts apply a two-injury rule similar to that in New York, in which the issue of whether two medical problems are "separate and distinct" is a question of fact to submitted to the jury. *Miller v. Armstrong World Indus., Inc.*, 817 P.2d 111, 113 (Colo.1991) (summary judgment held inappropriate in asbestos case given that "[t]he discovery of benign pleural thickening and pleural calcification does not trigger the running of the statute of limitations and may not be substituted for subsequent knowledge of the existence of a claim for asbestosis"). "The statute of limitations does not begin to run at the mere discovery of a physical process leading to injury." *Id.* While an exception exists where the discovery is of the defect causing the injury, the exception was held inapplicable in *Miller* to a plaintiff alleging a variety of medical problems relating to asbestos exposure, a situation analogous to the instant one. *Id.*

### b. Larson

Larson presents difficult issues. The only state law that was briefed on the motion was Alaska's—the place of exposure. Under the manifestation-based formulation, more information is required about the precise states where each medical problem became manifest. The possibilities are: California, Kentucky, Texas, Virginia and Mexico. Moreover, defendants and the plaintiff will have to clarify their positions regarding plaintiff's residence during 1976–1977, a period of time in which she identifies residences in both Mexico and California. Given the failure of defendants to demonstrate at this stage of the litigation that any applicable law would bar Larson's claim, denial of the motion is required pending further development of the law and facts.

## III. APPLICATION OF STATUTE OF LIMITATIONS LAW TO FACTS

The court cannot conclusively determine, based on the submissions to date, whether any of the plaintiffs had knowledge of facts from which their injuries could reasonably be inferred that would bar any of their claims.

### A. Babb

Babb's medical problems became manifest while she was a resident of New York. The New York statute of limitations is the only defense asserted. Plaintiff asserts that she was unaware of the cause of her medical problems until 1995, an allegation disputed by defendants. The question of when plaintiff actually became aware, or should have become aware, of the human cause of her medical problems is for the jury.

Even if claims based on her earlier medical problems were to be found timebarred, Babb contends that New York's two-injury rule applies to her second miscarriage in 1993. Since this miscarriage occurred after March 28, 1992 (i.e., three years before this claim was filed), it would be an actionable injury if separate and distinct from earlier medical problems. It seems unlikely that each miscarriage, in a series of DES-related miscarriages, is separate and distinct. Nonetheless, medical testimony may be required to determine whether the conditions that caused Babb's first miscarriage were also implicated in the second, and if so, whether the second miscarriage could have been predicted with some certainty.

### B. Cassell

As a New York-resident who claims only recently to have connected her DES exposure to her medical problems, Cassell's situation is similar to that of Babb. For the same reasons, it is for the jury to determine when

she became aware of, or should have become aware of, the human cause of her medical problems.

 Cassell claims not to have discovered her infertility until March, 1993, well within the limitations period. Even under the most restrictive approach, an action based on her infertility may be timely were a jury to determine that her alleged date of discovery was reasonable. Scientific expert testimony may be required to discern whether her infertility is separate and distinct from her earlier medical problems.

### C. Colello–Moltzen

Colello–Moltzen's medical problems became manifest while she was a resident of California. The New York statute of limitations is the only defense asserted. For reasons noted previously, it is for the jury to determine when plaintiff became aware of the human cause of her medical problems.

 Colello–Moltzen asserts that she did not learn of her incompetent cervix until it was diagnosed in 1994, within the limitations period. Defendants dispute this factual assertion, and also contend that plaintiff's incompetent cervix is not "separate and distinct" from plaintiff's other medical problems. With respect to defendants' first objection, the factual dispute is appropriately resolved by the jury. With respect to defendants' second objection, testimony by medical experts about the relationship and possible interrelationship of DES-related medical problems may be required.

### D. Friedman

Friedman's medical problems became manifest while she was a resident of New York. For reasons noted previously, it is for the jury to determine when plaintiff became aware of the human cause of her medical problems.

With respect to her infertility, which plaintiff contends to have only learned about recently, a jury will have to determine whether plaintiff should have learned of it earlier. Scientific evidence may be required to determine whether her infertility is separate and distinct from her earlier medical problems.

### E. Harnett

Harnett's various medical problems became manifest when she was a resident of either Colorado or Florida. The shorter of the New York and Colorado statutes of limitations might apply to some medical problems, and the shorter of the New York and Florida limitations period might apply to others. Jury questions are presented under all three states' law as to when plaintiff learned or should have learned of her infertility, its human cause, and whether her infertility is separate and distinct from medical problems discovered earlier.

### F. Larson

 From the record to date, it is impossible to determine where Larson was a resident when each of her medical problems became manifest. The possibilities include: California, Kentucky, Texas, Virginia and Mexico. Even under the most restrictive test, however, factual questions exist regarding when plaintiff learned, or should have learned of her infertility (which she alleges is still in doubt), and whether plaintiff's endometriosis, diagnosed in 1995, is separate and distinct from her earlier medical problems. The jury can consider whether plaintiff should be charged with knowledge of her endometriosis at an earlier date, as defendants suggest, in light of her delay (from 1991 to 1995) in undergoing the laparoscopy recommended by her doctors.

### G. Zahn

Zahn's various medical problems became manifest when she was a resident of either Massachusetts or Virginia. The shorter of the New York and Massachusetts statutes of limitations might apply to some medical problems, and the shorter of the New York and Virginia limitations period might govern others. Only the New York statute of limitations, however, is asserted as the basis for summary judgment. Jury questions under New York law include when plaintiff became aware, or should have become aware, of the human cause of her medical problems, and

when she discovered, or should have discovered, her infertility.

A factual dispute over whether or not plaintiff has a T-shaped uterus will have to be resolved by further submissions. Zahn has provided sufficient evidence so that, on the present record, she cannot be denied the opportunity to establish a prima facie case at trial. If Zahn establishes that she learned of her T-shaped uterus in 1993, a claim based on that medical problem would be timely under New York law unless a jury determines that she should have discovered it earlier, and unless medical testimony establishes that Zahn's T-shaped uterus is not "separate and distinct" from her earlier medical problems, including the 1991 discovery through a hysteroscopy of a uterine "ridge."

## IV. SUBSTANTIVE CHALLENGES— HARNETT, MINOR AND WHITE

Defendants seek to dismiss the claims of Harnett, Minor and White on the grounds that their claims are not recognized under the relevant states' substantive law since those states have not adopted a form of market share liability. After their complaints were filed, Harnett, Minor and White each identified a specific company, Eli Lilly & Co., as the manufacturer of the DES ingested by their mothers. In light of this identification, the claims against all defendants, save Eli Lilly & Co., are dismissed as to these three plaintiffs. No review of the substantive laws of the states where their causes of action accrued is required at this time.

## V. CONCLUSION

Defendants' motions for summary judgment are denied. The many disputed factual issues should either be resolved by a jury at trial or by the judge after expert testimony and other evidence is available. Harnett's, Minor's and White's claims against all defendants, save Eli Lilly & Co., are dismissed.

SO ORDERED.